**2023 IL 129453**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 129453)

DAN CAULKINS *et al.*, Appellees, v. JAY ROBERT PRITZKER, in His Official Capacity as Governor of the State of Illinois, *et al.*, Appellants.

*Opinion filed August 11, 2023.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville and Cunningham concurred in the judgment and opinion.

Justice Holder White dissented, with opinion, joined by Justice Overstreet.

Justice O'Brien dissented, with opinion.

## OPINION

¶ 1        The Protect Illinois Communities Act (Act) restricts firearms and related items that the Act defines as "an assault weapon, assault weapon attachment, .50 caliber

rifle, or .50 caliber cartridge" (collectively, assault weapons) (720 ILCS 5/24-1.9(b) (West 2022)) and "large capacity ammunition feeding device[s]," commonly known as large capacity magazines (LCMs) (*id.* § 24-1.10(b)). Certain restrictions do not apply to (1) law enforcement agencies and individuals who complete firearms training as part of their employment in law enforcement, corrections, the military, and private security (trained professionals) (*id.* §§ 24-1.9(e), 24-1.10(e)) and (2) individuals who possessed assault weapons or LCMs before the restrictions became effective (grandfathered individuals) (*id.* §§ 24-1.9(d), 24-1.10(d)).

¶ 2        The circuit court of Macon County entered declaratory judgment for plaintiffs on two claims that the restrictions are facially unconstitutional because the exemptions deny the "law-abiding public" equal protection (Ill. Const. 1970, art. I, § 2) and constitute special legislation (*id.* art. IV, § 13) under the Illinois Constitution. Defendants appeal directly to this court. Ill. S. Ct. R. 302(a)(1) (eff. Oct. 4, 2011).

¶ 3        Plaintiffs defend the judgment on equal protection and special legislation grounds and allege for the first time that, regardless of the exemptions, the restrictions violate the second amendment to the United States Constitution. U.S. Const., amend. II. They further argue that Public Act 102-1116 (eff. Jan. 10, 2023), which added sections 24-1.9 and 24-1.10 to the Criminal Code of 2012 (720 ILCS 5/1-1 *et seq.* (West 2022)), violates the three-readings requirement of the Illinois Constitution and that the circuit court erred in ruling to the contrary. Ill. Const. 1970, art. IV, § 8(d).

¶ 4        First, we hold that the exemptions neither deny equal protection nor constitute special legislation because plaintiffs have not sufficiently alleged that they are similarly situated to and treated differently from the exempt classes. Second, plaintiffs expressly waived in the circuit court any independent claim that the restrictions impermissibly infringe the second amendment. Third, plaintiffs' failure to cross-appeal is a jurisdictional bar to renewing their three-readings claim. Accordingly, we reverse the circuit court and enter judgment for defendants on the equal protection and special legislation claims. We express no opinion on the potential viability of plaintiffs' waived claim concerning the second amendment.

¶ 5                                   I. BACKGROUND

¶ 6                                      A. The Act

¶ 7         The Act amended the Criminal Code of 2012 to restrict access to assault
weapons and LCMs. Pub. Act 102-1116, § 25 (eff. Jan. 10, 2023) (adding 720 ILCS
5/24-1.9, 24-1.10). The Act, effective January 10, 2023, prohibits the purchase and
sale, manufacture, delivery, and import of firearms defined by the statute as "assault
weapons," except sales to persons in other States or to those authorized to acquire
them under the Act's enumerated exemptions for certain professionals. 720 ILCS
5/24-1.9(b) (West 2022). The Act also prohibits possession of assault weapons
beginning on January 1, 2024.

¶ 8         However, the Act contains two exemptions relevant here. A "grandfather"
provision permits persons who lawfully possessed assault weapons before January
10, 2023, to continue to possess them as long as they provide an endorsement
affidavit to the Illinois State Police by January 1, 2024. *Id.* § 24-1.9(c), (d). Those
who inherit a lawfully owned assault weapon may retain it upon providing an
endorsement affidavit. *Id.* § 24-1.9(d)(2)(ii). An endorsement affidavit, which is
executed electronically as a form through a Firearm Owner's Identification (FOID)
card account (430 ILCS 65/4.1 (West 2022)), identifies the weapon and affirms that
the individual owned it before January 10, 2023. 720 ILCS 5/24-1.9(d) (West
2022).

¶ 9         The Act also restricts the manufacture, delivery, sale, and purchase of LCMs,
except the restriction on possession took effect on April 10, 2023, and the Act does
not require endorsement affidavits for LCMs. *Id.* § 24-1.10(b)-(d).

¶ 10        In addition to the "grandfather" provision, the Act exempts seven enumerated
classes from the restrictions on possession and purchase. Four of the exemptions
apply to law enforcement agencies, peace officers, corrections officials, and active
and retired law enforcement officers qualified under the federal Law Enforcement
Officers Safety Act of 2004 (18 U.S.C. §§ 926B, 926C (2018)), as recognized under
Illinois law. Those included in this law-enforcement exemption are required by law
to receive firearms training and qualifications. 720 ILCS 5/24-1.9(e)(1)-(4), 24-
1.10(e)(1)-(4) (West 2020).

¶ 11 Three other exemptions apply to members of the armed services, the reserve forces, and the Illinois National Guard; licensed private security guards; and guards at nuclear facilities, all of whom also receive firearms training by virtue of their employment. The Act permits them to possess assault weapons and LCMs, but only to the extent required by their official duties. *Id.* §§ 24-1.9(e)(5)-(7), 24-1.10(e)(5)-(7).

¶ 12 B. The Complaint

¶ 13 Plaintiffs are a business, two separately named individuals, and a voluntary unincorporated association, consisting of hundreds of individuals and businesses. All plaintiffs allege they "possess or otherwise desire to deliver, sell, import, or purchase" assault weapons as defined by section 24-1.9(a) "and/or manufacture, deliver, sell, or purchase" LCMs as defined by section 24-1.10(a).

¶ 14 Plaintiff Decatur Jewelry is a licensed pawn broker engaged in intrastate and interstate commerce involving "the sale, possession, and transfer of firearms." Decatur Jewelry, which as a pawn broker holds certain assault weapons as security, alleges sections 24-1.9 and 24-1.10 criminalize the return of those weapons to their rightful owners.

¶ 15 Dan Caulkins and Perry Lewin are residents and citizens of Illinois who also "possess or otherwise desire to deliver, sell, import, or purchase" assault weapons "and/or manufacture, deliver, sell or purchase" LCMs.

¶ 16 Law-Abiding Gun Owners of Macon County is an association of "similarly interested members associated for the purpose of protecting the Second Amendment and Property rights of law-abiding gun owners." Members must possess a valid FOID card.

¶ 17 The complaint alleged six counts seeking declaratory and injunctive relief, and the parties filed opposing motions for summary judgment. Plaintiffs moved for summary judgment only on counts IV and V, which alleged violations of the Illinois Constitution's equal protection and special legislation clauses.

¶ 18 Count IV, the equal protection claim, alleged the trained professionals are "seemingly a protected class based upon their occupations" and "are wholly exempt

- 4 -

based on their employment status." The claim alleged that "[c]reating an exempt status for those persons is not only irrational and completely lacking anything approaching common sense, there are no set of facts wherein it can survive a constitutional attack based upon equal protection regardless of the standard of review." Count IV alleged, "At issue is the infringement of a right to bear arms as guaranteed by the Illinois Constitution" such that the restrictions "are indisputably in violation of the Plaintiffs [*sic*] equal rights to be treated the same as their fellow citizens who are similarly situated in regard to their individual and fundamental constitutional rights to bear arms for self-defense." Count IV sought a judgment declaring sections 24-1.9(a) and 24-1.10(a) unconstitutional under the equal protection clause.

¶ 19     Count V, the special legislation claim, alleged "the 2nd Amendment protects the additional right to commercial and non-commercial sale of arms," while sections 24-1.9 and 24-1.10 "create an economic franchise for those excepted from its criminal provisions to engage commerce, commercial and non-commercial, in gun sales on a broader basis not available to all who own 'assault weapons' or desire to purchase, gift, receive or sell 'assault weapons.' " Count V sought a judgment declaring sections 24-1.9 and 24-1.10 unconstitutional for creating special classifications according to the excepted class, which enjoys "an economic franchise" in violation of the special legislation clause.

¶ 20     To the extent the complaint made isolated references to the right to keep and bear arms under either the second amendment or article I, section 22, of the Illinois Constitution, it was to claim that plaintiffs, as members of the law-abiding public with valid FOID cards, are similarly situated to the exempt classes for equal protection and special legislation purposes. Neither count IV nor count V alleged the restrictions violate the second amendment.

¶ 21                                    C. The Judgment

¶ 22     The circuit court determined that *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶ 65, which had upheld a temporary restraining order on an equal protection challenge to sections 24-1.9 and 24-1.10, entitled plaintiffs to summary judgment on their equal protection and special legislation claims. The circuit court ruled that the rights to bear arms under the state and federal constitutions are

- 5 -

fundamental rights; therefore, the challenged legislation was subject to strict scrutiny, which the legislation did not satisfy.

¶ 23    The circuit court did not consider whether plaintiffs were similarly situated to, but treated differently from, the exempt classes. Instead, the circuit court ruled the restrictions (1) denied plaintiffs equal protection by infringing on their gun rights (count IV) and (2) constituted special legislation by conferring an arbitrary right upon those eligible for the exception while excluding plaintiffs (count V). The court entered judgment for defendants on the remaining counts, including plaintiffs' claim that the Act violates the three readings clause of the Illinois Constitution. Ill. Const. 1970, art. IV, § 8(d).

¶ 24    Defendants filed a notice of direct appeal under Illinois Supreme Court Rule 302(a)(1) (eff. Oct. 4, 2011). We granted the state's attorneys of 33 counties leave to submit a brief *amici curiae* in support of plaintiffs, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 25                                II. ANALYSIS

¶ 26                             A. Standard of Review

¶ 27    This appeal arises from plaintiffs' summary judgment motion for declaratory relief on the equal protection and special legislation claims. 735 ILCS 5/2-701(a) (West 2022).

>   "[S]ummary judgment should be granted only where the pleadings, depositions, admissions and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law." *Pielet v. Pielet*, 2012 IL 112064, ¶ 29.

See 735 ILCS 5/2-1005 (West 2022). We review a summary judgment *de novo*. *Pielet*, 2012 IL 112064, ¶ 30.

¶ 28    We also review a constitutional challenge to a statute *de novo* because it presents a question of law. *People v. Masterson*, 2011 IL 110072, ¶ 23. Legislative enactments have a strong presumption of constitutionality, and this court must

- 6 -

uphold the constitutionality of a statute when reasonably possible. *Id.* Plaintiffs, who are on the side challenging the constitutionality of sections 24-1.9 and 24-1.10 of the Act, bear the burden to prove the statutes' invalidity. *Id.*

¶ 29    Plaintiffs mount a facial challenge, which is the most difficult type of constitutional challenge. An enactment is invalid on its face only if no set of circumstances exists under which it would be valid. *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20. A facial challenge requires a showing that the statute is unconstitutional under any set of facts; the specific facts related to the challenging party are irrelevant. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006).

¶ 30                              B. The Second Amendment

¶ 31    As a preliminary matter, we address plaintiffs' argument that, regardless of how the exemptions implicate equal protection and special legislation, the restrictions themselves violate the right to keep and bear arms under the second amendment to the United States Constitution (U.S. Const., amend. II). Notably, plaintiffs do *not* assert the restrictions violate the corresponding right to arms set forth in article I, section 22, of the Illinois Constitution (Ill. Const. 1970, art. I, § 22). Plaintiffs' references to the Illinois right to arms are isolated and made only in opposition to subjecting the classifications to rational-basis scrutiny in the equal protection context. Plaintiffs contend in their brief that the second amendment—not article I, section 22—provides an independent basis for affirming the judgment.

¶ 32    Plaintiffs frame the second amendment as a threshold issue, asserting that, if the right to keep and bear arms does not tolerate the restrictions, the court need not decide whether the exemptions deny equal protection or constitute special legislation. Citing the principle that a reviewing court may sustain the decision of the circuit court on any grounds called for by the record (*Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 174 (1988)), plaintiffs ask this court to affirm the summary judgment because defendants did not demonstrate that the restrictions are consistent with the historical tradition of firearm regulation.

¶ 33    The second amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. "At its core, the second amendment protects the

right of law-abiding citizens to keep and bear arms for self-defense in the home." *Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 28 (citing *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The United States Supreme Court has stated, "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010); *Johnson v. Department of State Police*, 2020 IL 124213, ¶ 37.

¶ 34    Unlike equal protection, the second amendment does not concern the end that the government seeks to achieve and whether the means of doing so is an appropriate fit. See *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 507 U.S. ___, ___, 142 S. Ct. 2111, 2127 (2022). Instead, second amendment claims involve a fact-intensive inquiry asking (1) whether a plaintiff has shown that the regulated items fall in the category of "bearable arms" (*id.* at ___, 142 S. Ct. at 2132) that are "commonly used" for self-defense today (*id.* at ___, 142 S. Ct. at 2138) and, if so, (2) whether the restrictions are consistent with "this Nation's historical tradition of firearm regulation" (*id.* at ___, 142 S. Ct. at 2126).

¶ 35    For two reasons, these issues were never raised or considered below. First, plaintiffs omitted a second amendment claim from the complaint and expressly disclaimed it in their pleadings. Second, equal protection and second amendment challenges are analyzed under different standards.

¶ 36    A summary judgment motion is confined to the issues raised in the complaint, and a plaintiff may not raise new issues not pleaded in his complaint to support or defeat a motion for summary judgment. *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 43; *Filliung v. Adams*, 387 Ill. App. 3d 40, 51-52 (2008) (the purpose of a complaint is to define the claims in controversy, and if a party does not seek to amend his complaint, he cannot raise new claims in a summary judgment motion); *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 373 Ill. App. 3d 895, 900 (2007) ("A party cannot seek summary judgment on a theory that was never pled in the complaint.").

¶ 37    The complaint did not allege the restrictions violate the second amendment to the United States Constitution, and none of the six counts were labeled that way. Counts I and II sought a declaratory judgment that the Act violates the Illinois Constitution's single-subject rule and three-readings requirement, respectively. Ill.

Const. 1970, art. IV, § 8(d). Count III sought a declaratory judgment that the legislature's noncompliance with these rules denied plaintiffs due process. *Id.* art. I, § 2. Count VI alleged Decatur Jewelry had suffered a due process violation and a regulatory taking. And the complaint generally requested an injunction to enjoin enforcement of sections 24-1.9 and 24-1.10. Plaintiffs did not move for summary judgment on any of these claims, and none can be liberally construed as alleging a violation of the second amendment. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 110 (1996) ("A complaint must be liberally construed, to the end that controversies may be quickly and finally determined according to the substantive rights of the parties."); 735 ILCS 5/1-106 (West 2022).

¶ 38    The complaint mentioned the second amendment and article I, section 22, only in passing. Count IV cited article I, section 22, as it pertains to equal protection, and count V cited the second amendment as it pertains to special legislation. Both counts alleged the exemptions are subject to strict scrutiny because they impact a fundamental right. But invoking the right to keep and bear arms in the context of scrutinizing the Act's classifications is not the same as alleging the restrictions violate the second amendment. Plaintiffs directed counts IV and V at the exemptions, not the restrictions themselves.

¶ 39    Furthermore, plaintiffs repeatedly disclaimed any second amendment violation. First, they explained in their memorandum for injunctive relief that "[t]his current litigation is *not* testing the contours of [weapons'] classification, *per se*—that debate is engaged in federal court—and a more fact intensive dispute regarding historical understandings of the Second Amendment." (Emphasis added.)

¶ 40    Second, plaintiffs' summary judgment motion invoked the second amendment only to demonstrate they were similarly situated to the exempted classes for equal protection purposes. Acknowledging the difference between the equal protection clause and the second amendment, plaintiffs asserted "The question presented is *not* whether a weapon classification survives constitutional challenge. Rather, the question presented is whether citizens qualified to acquire and possess firearms and firearm ammunition can be treated differently in the application of the weapon classification." (Emphasis added.)

¶ 41    Plaintiffs made clear below that this dispute concerns equal protection and special legislation, but plaintiffs now attempt to piggyback a second amendment

claim onto those allegations to circumvent the fact-intensive *Bruen* analysis. The theory under which a case is tried in the circuit court cannot be changed on review, and an issue not presented to or considered by the circuit court cannot be raised for the first time on review. *In re Marriage of Schneider*, 214 Ill. 2d 152, 172 (2005). Allowing a party to change his theory of the case on review would weaken the adversarial process and the system of appellate jurisdiction and could also prejudice the opposing party, who did not have an opportunity to respond to that theory in the circuit court. *Id.*

¶ 42     The record demonstrates plaintiffs omitted a stand-alone second amendment claim from the complaint and expressly disclaimed it in the circuit court, resulting in waiver. Allowing plaintiffs to argue a novel theory that was neither pleaded nor argued below would prejudice defendants and amount to improper advocacy on plaintiffs' behalf. Plaintiffs chose not to present their case to the circuit court in second amendment terms, and we hold them to their decision. Plaintiffs are procedurally barred from challenging the weapon classification as violating the second amendment.

¶ 43     Moreover, even if we accepted plaintiffs' distorted view of the complaint or excused their unambiguous waiver, genuine questions of material fact would preclude summary judgment on a second amendment claim. Ascertaining whether the restrictions unconstitutionally infringe on the public's right to keep and bear arms requires consideration of whether the regulated items are bearable arms that are commonly used for self-defense and whether the regulations are consistent with this nation's historical traditions. Unsurprisingly, the record contains no evidence—beyond news articles—relevant to these questions because plaintiffs never raised them in the circuit court. Even if the complaint alleged a second amendment claim, the record does not support affirming the judgment on that basis. As plaintiffs expressly disclaimed a second amendment claim below, we offer no opinion on the potential viability of such a claim.

¶ 44                              C. Equal Protection and Special Legislation

¶ 45     This appeal concerns plaintiffs' assertion that the exemptions in sections 24-1.9 and 24-1.10 deny them equal protection. Article I, section 2, of the Illinois Constitution states that "[n]o person shall be deprived of life, liberty or property

- 10 -

without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2.

¶ 46 The equal protection clause guarantees that similarly situated individuals will be treated in a similar manner, unless the government can demonstrate an appropriate reason to treat those individuals differently. *In re M.A.*, 2015 IL 118049, ¶ 24. The equal protection clause does not forbid the legislature from drawing distinctions in legislation among different categories of people as long as the legislature does not draw those distinctions based on criteria wholly unrelated to the legislation's purpose. *Id.* The analysis applied to equal protection claims is the same under both the United States and Illinois Constitutions. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322 (1996).

¶ 47 The threshold question in the equal protection analysis is whether the claimant is "similarly situated" to the comparison group. " 'Evidence of different treatment of unlike groups does not support an equal protection claim.' " *M.A.*, 2015 IL 118049, ¶ 25 (quoting *In re Derrico G.*, 2014 IL 114463, ¶ 92). Two classes are similarly situated only when they are alike in all relevant respects. *Id.* ¶¶ 25, 33; *In re Destiny P.*, 2017 IL 120796, ¶ 15.

¶ 48 The determination of whether two classes are similarly situated is not made in the abstract. Rather, the court must consider the purpose of the particular legislation. *M.A.*, 2015 IL 118049, ¶¶ 26, 29. Assessing similarity

"is not a contextless comparison of the classes within the broader group. To meaningfully assess whether a claimant is similarly situated to all others in all relevant respects, we examine the positions of the claimant and all others in light of the broad purpose and operation of the statute. Whether a claimant is 'similarly situated' to other persons cannot be decided based solely on the very classification challenged as violating equal protection. Stated another way, a classification does not pass equal protection muster simply because the Legislature created two classes. To do so would beg the question and render the equal protection principle meaningless." *Fletcher Properties, Inc. v. City of Minneapolis*, 947 N.W.2d 1, 22 (Minn. 2020).

¶ 49 The special legislation clause supplements the equal protection clause, and in many cases, the two clauses provide the same protection. *In re Estate of Jolliff*, 199

Ill. 2d 510, 519 (2002). The legislature enjoys broad discretion in making statutory classifications, but the special legislation clause prohibits the legislature from conferring a benefit or privilege upon one group while excluding other similarly situated groups. *Id.* The special legislation clause is intended to prevent legislative classifications without a sound and reasonable basis from discriminating in favor of a select group. *Id.* Plaintiffs concede the equal protection analysis in this action also applies to their special legislation challenge, as a special legislation challenge is generally judged under the same standards that apply to an equal protection challenge. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 24.

¶ 50                                    1. Legislative Purpose

¶ 51        To assess whether plaintiffs are similarly situated to but treated differently from the exempt groups, we examine the relative positions of the two classes in light of the broad purpose and operation of the statute. The Act does not state a legislative purpose motivating the restrictions and exemptions in section 24-1.9 and 24-1.10. Defendants infer from the statutory scheme that the Act is intended to reduce the number of assault weapons and LCMs in circulation because they are often used by perpetrators of mass shootings.

¶ 52        Plaintiffs respond that inferring a legislative purpose where none is expressed amounts to improper speculation. They rely on *Accuracy Firearms*, which held the legislature's failure to articulate an express legislative purpose for the Act obviated the requirement for the equal-protection claimants to allege they were similarly situated to the exempt groups. *Accuracy Firearms*, 2023 IL App (5th) 230035, ¶ 61. The majority held,

> "Here, it is extremely relevant that no purpose of the legislation and no basis for the classifications was provided at the time plaintiffs' pleadings were filed. As such, any allegation regarding similarity would be speculative, at best. *** As the basis for the exempted classification was unavailable, it is undeniable that a specific allegation as to how any plaintiff might be similarly situated to one of the exempted classes would be pure conjecture, beyond the fact that each plaintiff and all those now in an exempted class were similarly situated, and indeed possessed the same rights, prior to January 23, 2023." *Id.*

¶ 53    The *Accuracy Firearms* court was misguided in dispensing with the threshold question of whether the equal-protection claimants were similarly situated to the exempt groups. It is axiomatic that an equal-protection claimant must show he is similarly situated to the comparison group, and assessing the similarity requires an analysis of the legislation's purpose. *Masterson*, 2011 IL 110072, ¶ 25. Sometimes, the legislative purpose is unclear, but that does not excuse the claimant from showing similarity. Justice Powell once observed in the equal protection context that "a legislative body rarely acts with a single mind" and "compromises blur purpose." *Schweiker v. Wilson*, 450 U.S. 221, 244 n.6 (1981) (Powell, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). "Therefore, it is appropriate to accord some deference to the executive's view of legislative intent, as similarly we accord deference to the consistent construction of a statute by the administrative agency charged with its enforcement." *Id.* "Ascertainment of actual purpose to the extent feasible, however, remains an essential step in equal protection." *Id.*

¶ 54    When assessing a claimant's similarity to the comparator class, a court may glean legislative purpose from the statutory scheme and the classifications themselves. See *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975) (an examination of the legislative scheme and its history may demonstrate that the purpose asserted by the government could not have been a goal of the legislation).

¶ 55    Here, the trained professionals comprise seven enumerated categories of individuals who are exempt from the purchase and possession restrictions based on their employment status and training. Four of the exemptions apply to law enforcement agencies, peace officers, corrections officials, and certain current and retired law enforcement officers. Those who qualify are required by law to receive firearms training and qualifications. 720 ILCS 5/24-1.9(e)(1)-(4), 24-1.10(e)(1)-(4) (West 2022).

¶ 56    Specifically, the restrictions on the purchase or possession of assault weapons and LCMs do not apply to " 'Peace officers' " (*id.* §§ 24-1.9(e)(1), 24-1.10(e)(1)), who are defined as

    "(i) any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses, or (ii) any person who, by statute, is granted and authorized to exercise powers similar to

- 13 -

those conferred upon any peace officer employed by a law enforcement agency of this State" (*id.* § 2-13).

¶ 57    The exemption also applies to "Qualified law enforcement officers and qualified retired law enforcement officers," defined under the federal Law Enforcement Officers Safety Act of 2004 (18 U.S.C. §§ 926B, 926C (2018)), as recognized under Illinois law, as employees of a governmental agency who are (or were) authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law and has statutory powers of arrest or apprehension under section 807(b) of Title 10 of the United States Code (article 7(b) of the Uniform Code of Military Justice) (10 U.S.C. § 807(b) (2018)). 720 ILCS 5/24-1.9(e)(2), 24-1.10(e)(2) (West 2022). Qualified law enforcement officers must be authorized by the agency to carry a firearm, must not be the subject of any disciplinary action that could result in suspension or loss of police powers, must meet agency standards that require the employee to regularly qualify in the use of a firearm, must not be under the influence of alcohol or another intoxicating or hallucinatory drug or substance, and must not be prohibited by federal law from receiving a firearm. 18 U.S.C. § 926B (2018). Qualified retired law enforcement officers, though no longer authorized to engage in law enforcement, must have met these requirements before their separation from service, and they are further defined in part as having 10 years' aggregate service and continuing to maintain, at their expense, training on the standards for qualification in firearms for active law enforcement officers. *Id.* § 926C.

¶ 58    The exemption similarly allows acquisition and possession of restricted items by federal, state, or local law enforcement agencies for the purpose of equipping peace officers, qualified law enforcement officers, and qualified retired law enforcement officers. 720 ILCS 5/24-1.9(e)(3), 24-1.10(e)(3) (West 2022). Finally, the exemption applies to wardens, superintendents, and keepers of prisons, penitentiaries, and jails. *Id.* §§ 24-1.9(e)(4), 24-1.10(e)(4).

¶ 59    Three other exempt classes include members of the armed services, reserve forces of the United States, or the Illinois National Guard; licensed private security guards and their employers; and guards at nuclear facilities, who all receive firearms training by virtue of their employment. *Id.* §§ 24-1.9(e)(5)-(7), 24-

1.10(e)(5)-(7). The Act permits these three groups to possess assault weapons and LCMs, but only while "performing their official duties." *Id.* §§ 24-1.9(e)(5)-(7), 24-1.10(e)(5)-(7).

¶ 60    The Act's grandfather provision permits persons who lawfully possessed an assault weapon before January 10, 2023, to continue to possess it as long as they provide an endorsement affidavit. *Id.* § 24-1.9(d). The affidavit must contain the person's FOID card number and an affirmation that the affiant possessed the assault weapon before the Act's effective date or inherited the assault weapon from an authorized person. *Id.* The provision restricts the transfer of an assault weapon to only an heir, an individual residing in another state and maintaining it in another state, or a federally licensed firearms dealer. *Id.* The grandfather provision similarly permits possession and restricts transfer of LCMs, but an endorsement affidavit is not required. *Id.* § 24-1.10(d).

¶ 61    The grandfather provision restricts where assault weapons and LCMs may be taken. A grandfathered individual may possess the restricted items only (1) on private property owned or immediately controlled by the person; (2) on private property that is not open to the public with the express permission of the person who owns or immediately controls such property; (3) while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair; (4) while engaged in the legal use of the assault weapon or LCM at a properly licensed firing range or sport shooting competition venue; or (5) while traveling to or from these locations, provided that the assault weapon or LCM is stored unloaded and enclosed in a case, firearm carrying box, shipping box, or other container. *Id.* §§ 24-1.9(d), 24-1.10(d).

¶ 62    Although the legislature did not state an express goal of the Act, the statutory scheme plainly implements firearms restrictions in furtherance of public health, safety, and welfare, with exceptions for those (1) who have undertaken specialized training as part of their employment in law enforcement, the military, or security or (2) who have a reliance interest in retaining possession of items legally acquired before such acquisition was prohibited and who adhere to new restrictions on possession and transfer. The Act attempts to balance public safety against the expertise of the trained professionals and the expectation interests of the grandfathered individuals.

¶ 63    The restrictions and exemptions are consistent with defendants' representation that "the Act seeks to accomplish the legislative goal of reducing the number of assault weapons and LCMs in circulation, because they are often used by perpetrators of mass shootings," and the method of accomplishing that goal is "limiting the number of firearms and magazines most likely to result in a mass shooting—by restricting the sale, purchase, and possession of new ones." This legislative purpose informs our analysis of whether plaintiffs have alleged they are similarly situated to but treated differently from the exempt groups.

¶ 64                        2. The Trained Professionals

¶ 65    Plaintiffs argue they were denied equal protection because "[t]he facial classification under the Act criminalizes acquisition or possession by some law-abiding citizens qualified to acquire or possess a firearm/bearable arm under the Second Amendment and immunizes from criminal penalty other law-abiding citizens qualified to acquire or possess under the Second Amendment. All are FOID card holders."

¶ 66    Plaintiffs also make a parallel argument that the statutes constitute special legislation. Plaintiffs contend "the similarly situated comparator here are law-abiding gun-owners holding valid FOID cards qualified to acquire or possess firearms (bearable arms) in the home for defense under the preexisting fundamental right codified by the Second Amendment."

¶ 67    Plaintiffs' position is that as "law-abiding gun owners" they are similarly situated to the trained professionals because "[a]ll are FOID card holders" with second amendment rights. Plaintiffs' position has intuitive appeal, but an examination of the FOID Act's requirements demonstrates plaintiffs and the trained professionals are not similar in all relevant respects. See 430 ILCS 65/0.01 *et seq.* (West 2022).

¶ 68    A FOID card applicant must submit to the Illinois State Police evidence of eligibility, based on his or her age, citizenship, criminal history, and several other factors. See *id.* § 4(a). But FOID card eligibility does not entail any kind of firearms training or qualification in furtherance of public safety. A FOID card holder does not have a duty to maintain public order; to make arrests for offenses; or to prevent,

- 16 -

detect, investigate, prosecute, or incarcerate a person for a violation of law. By contrast, each of the seven categories of trained professionals must undergo specialized firearms training pertaining to their employment to maintain their exempt status under the Act. This training supports the presumption that they exercise greater responsibility in the safe handling and storage of firearms. "The charge of protecting the public, and the training that accompanies that charge, is what differentiates the exempted personnel from the rest of the population." *Shew v. Malloy*, 994 F. Supp. 2d 234, 252 (D. Conn. 2014), *aff'd in part and rev'd in part sub nom. New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015). "Similarly, members of the military and government agency personnel who use the otherwise banned firearms and magazines in the course of their employment should also have an advantage while maintaining public safety \*\*\*." *Id.* Because FOID card holders are not similar in all relevant respects to the trained professionals, plaintiffs have not sufficiently alleged the similarly situated element, and their equal protection and special legislation challenges to the classification fail.

¶ 69                              3. The Grandfathered Individuals

¶ 70        Plaintiffs next argue they are denied equal protection because the grandfathered individuals are afforded preferential treatment. Plaintiffs and the grandfathered individuals can retain their previously acquired restricted items but may acquire no more. Plaintiffs allege they "possess or desire to" acquire additional assault weapons and LCMs as prohibited by sections 24-1.9 and 24-1.10 of the Act.

¶ 71        The complaint alleges plaintiffs' possession in the disjunctive. To the extent plaintiffs allege they do *not* already possess restricted items, they are prohibited from acquiring new ones, while the grandfathered individuals may retain theirs. But unlike plaintiffs who do not already possess restricted items, the grandfathered individuals have a reliance interest based on their acquisition before the restrictions took effect. By pointing out that those who already possess restricted items may retain them under the grandfather provision, the complaint makes clear that plaintiffs are not similarly situated to the exempt class. See *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (holding, in a challenge to a zoning decision, that the plaintiff was not similarly situated to others who received

different treatment for different reasons); *Jucha v. City of North Chicago*, 63 F. Supp. 3d 820, 831 (N.D. Ill. 2014) (grandfather provision rendered the claimant dissimilar to the comparator).

¶ 72 To the extent plaintiffs allege they already possess restricted items, plaintiffs may retain them but may not acquire more, which matches the restrictions placed on those who are grandfathered under the Act. The statutes treat plaintiffs who already possess assault weapons and LCMs the same as the grandfathered individuals.

¶ 73 Plaintiffs also argue "[t]he grandfathered possess the assault weapon because of the codified preexisting fundamental right to keep and bear arms for self-defense at home, not because of a legislative act upon which reliance was placed." Plaintiffs essentially contend the restrictions infringe plaintiffs' second amendment rights, while the exemptions protect the grandfathered individuals' second amendment rights. This is tantamount to arguing the restrictions violate the second amendment, which plaintiffs expressly disclaimed below.

¶ 74 Plaintiffs' equal protection challenge to the grandfather provision lacks merit, and by the same token, plaintiffs' special legislation claim fails because sections 24-1.9 and 24-1.10 do not improperly discriminate in favor of the grandfathered group and against plaintiffs.

¶ 75 D. Three Readings

¶ 76 Finally, plaintiffs argue count II of their complaint provides an independent basis for affirming the judgment. Count II alleged that Public Act 102-1116, which added sections 24-1.9 and 24-1.10 to the Criminal Code of 2012, violates the three-readings requirement of the Illinois Constitution. The Constitution provides a "bill shall be read by title on three different days in each house." Ill. Const. 1970, art. IV, § 8(d). Count II alleged that the legislature did not follow this procedure and that therefore the Act should be invalidated in its entirety. See *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328 (2003) (three readings violation would invalidate entire public act).

¶ 77    As mentioned, a reviewing court may affirm the judgment on any grounds called for by the record, regardless of whether the circuit court made its decision on the proper ground. *Landmarks Preservation Council of Illinois*, 125 Ill. 2d at 174. But a party seeking to modify a partially adverse judgment must file a cross-appeal within 30 days of the judgment. *Id.* ("findings of the circuit court adverse to the appellee do not require that the appellee cross-appeal if the judgment of the circuit court was not, at least in part, against him"); *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983) (an appellee's failure to cross-appeal from the part of the judgment denying a claim for interest precluded consideration of the issue); see Ill. S. Ct. R. 303(a)(3) (eff. July 1, 2017).

¶ 78    Here, the circuit court invalidated sections 24-1.9 and 24-1.10 but upheld the remainder of the Act, including provisions that are unrelated to this action. Besides adding sections 24-1.9 and 24-1.10, Public Act 102-1116 amended section 2605-35 of the Illinois State Police Law of the Civil Administrative Code of Illinois to clarify that the Division of Criminal Investigation may investigate human trafficking, illegal drug trafficking, and illegal firearms trafficking. See Pub. Act 102-1116, § 5 (eff. Jan. 10, 2023) (amending 20 ILCS 2605/2605-35(a)(7)). Public Act 102-1116 also amended section 1-10 of the Illinois Procurement Code to exempt the Illinois State Police's purchase of software to enforce the Firearm Owners Identification Card Act (430 ILCS 65/0.01 *et seq.* (West 2022)) and related statutes. See Pub. Act 102-1116, § 7 (eff. Jan. 10, 2023) (adding 30 ILCS 500/1-10(b)(21)). And Public Act 102-1116 amended sections 40, 45, and 55 of the Firearms Restraining Order Act to increase the initial duration of such orders to up to one year. See Pub. Act 102-1116, § 15 (eff. Jan. 10, 2023) (amending 430 ILCS 67/40, 45, 55).

¶ 79    The judgment was partially adverse to plaintiffs because it did not invalidate the entire Act as requested in count II. Plaintiffs' failure to cross-appeal from the part of the judgment denying relief on their three-readings claim is a jurisdictional bar to them arguing the Act is unconstitutional on that basis. *Landmarks Preservation Council of Illinois*, 125 Ill. 2d at 174.

¶ 80                                    III. CONCLUSION

¶ 81        First, we hold the circuit court erroneously entered summary judgment for plaintiffs on their equal protection and special legislation claims. Plaintiffs are not similarly situated to the trained professionals. To the extent plaintiffs claim they possess restricted items, they are not treated differently from the grandfathered individuals. To the extent plaintiffs claim they do *not* possess restricted items, they are dissimilar to the grandfathered individuals, who have a reliance interest in retaining them.

¶ 82        Second, we hold that plaintiffs waived any second amendment challenge to the restrictions, as the complaint did not state a claim and plaintiffs explicitly and repeatedly disclaimed any such argument in the circuit court. Third, we hold plaintiffs' failure to cross-appeal from the denial of relief under count II bars them from renewing their three-readings claim here. For these reasons, the judgment of the circuit court of Macon County is reversed.

¶ 83        Judgment reversed.

¶ 84        JUSTICE HOLDER WHITE, dissenting:

¶ 85        This great nation was founded on the premise that the right of law-abiding citizens to bear arms is essential to what it means to be a free people. The right of law-abiding citizens to possess firearms and to arm themselves to protect their families, their homes, and themselves must not be infringed. Belief in the previously mentioned precepts in no way diminishes the fact that all law-abiding citizens desire safe communities where schools, workplaces, houses of worship, and public gatherings are free from gun violence. The tension between the previously mentioned tenets are why this case is of such importance to the people of the state of Illinois. However, if this court is to adhere to the Illinois Constitution, we cannot address the question of the firearm restrictions at issue in this case. Important as this case is, constitutionally embedded process matters. Where the legislature fails to honor our constitutionally mandated process, this court is duty bound to adhere to our constitution and require the legislature to do the same. In my view, this court can and should consider the issue of the three-readings rule as

- 20 -

well as the continued adherence to the enrolled-bill doctrine. In doing so, I would find the clear violation of the rule renders Public Act 102-1116 (eff. Jan. 10, 2023) unconstitutional in its entirety, thereby obviating the need to address the firearm restrictions at issue in this appeal. Thus, I respectfully dissent.

¶ 86                      A. Plaintiffs' Claim on the Three-Readings Rule

¶ 87      As the majority notes and as this court has often found, "a reviewing court can uphold the decision of the circuit court on any grounds which are called for by the record regardless of whether the circuit court relied on the grounds and regardless of whether the circuit court's reasoning was correct." *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007); see also *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983) (stating "[i]t is the judgment and not what else may have been said by the lower court that is on appeal to a court of review").

¶ 88      In this case, plaintiffs alleged in count II of their complaint that Public Act 102-1116, which added sections 24-1.9 and 24-1.10 to the Criminal Code of 2012 (720 ILCS 5/24-1.9, 1.10 (West 2022)), violated the three-readings requirement of the Illinois Constitution. In their summary judgment motion, defendants argued they were entitled to summary judgment on the three-readings claim because the enrolled-bill doctrine foreclosed plaintiffs' challenge. The circuit court entered judgment in defendants' favor on the three-readings claim, as it was duty bound to follow this court's precedent involving the enrolled-bill doctrine. The court did, however, find in plaintiffs' favor on their equal protection and special legislation claims.

¶ 89      Defendants appealed. In light of the circuit court's favorable ruling on the three-readings rule, they had no reason to raise the issue in their initial brief. Plaintiffs, however, did raise this issue in their responsive brief, arguing the violation of the three-readings rule presented an independent basis in the record to affirm the circuit court's judgment. In their reply brief, defendants argued there was no violation of the three-readings rule and the enrolled-bill doctrine foreclosed plaintiffs' challenge. Defendants also addressed the three-readings rule and the enrolled-bill doctrine in their oral argument to this court.

¶ 90 The majority says the circuit court invalidated certain sections of the Protect Illinois Communities Act (Act) (see Pub. Act 102-1116 (eff. Jan. 10, 2023)) and upheld others and thus contends the three-readings-rule issue is not now before us because plaintiffs should have cross-appealed from the denial of relief on that claim. However, plaintiffs are properly before this court, and both parties have had ample opportunity to address the procedural requirements of the Illinois Constitution and their impact on the validity of the Act here. Moreover, if the invalidated sections are before us (by way of the State's appeal), then a finding of a three-readings-rule violation on those sections (as we may affirm on any basis in the record) requires a similar finding as to the entire Act because the Act was passed as one. Thus, I would find the long-standing principle cited above in *Ultsch* and numerous other cases allows us to consider the three-readings issue.

¶ 91                        B. The Three-Readings Rule and the Enrolled-Bill Doctrine

¶ 92 Article IV, section 8, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8) sets forth the requirements for the passage of bills in the legislature. Section 8(d) states as follows:

> "(d) *A bill shall be read by title on three different days in each house*. A bill and each amendment thereto shall be reproduced and placed on the desk of each member before final passage.
>
> Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject. Appropriation bills shall be limited to the subject of appropriations.
>
> A bill expressly amending a law shall set forth completely the sections amended.
>
> *The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met*." (Emphases added.) Id. § 8(d).

¶ 93 For years, this court has followed the enrolled-bill doctrine. *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328 (2003). "This doctrine provides that once the Speaker of the House of Representatives and the President of the

- 22 -

Senate certify that the procedural requirements for passing a bill have been met, a bill is conclusively presumed to have met all procedural requirements for passage." *Id.* at 328-29. Under this precedent, this court has said it "will not invalidate legislation on the basis of the three-readings requirement if the legislation has been certified." *Id.* at 329.

¶ 94 In *People v. Dunigan*, 165 Ill. 2d 235, 252 (1995), the defendant argued the public act at issue was not validly enacted because the legislature failed to comply with the three-readings requirement. This court refused to consider the argument, concluding the enrolled-bill doctrine precluded "this court from inquiring into the legislature's compliance with the procedural requirements for passage of bills." *Id.* at 253. This court cited the Committee on the Legislature of the Constitutional Convention, which explained the enrolled-bill doctrine would prohibit the judiciary from invalidating statutes on the ground that the legislature failed to comply with the procedural requirements in article IV, section 8, of the Illinois Constitution. *Id.* The court went on to state: "Whether or not a bill has been read by title on three different days in each house is a procedural matter, the determination of which was deliberately left to the presiding officers of the two houses of the General Assembly." *Id.* at 254.

¶ 95 Justice Heiple dissented from that portion of the majority opinion that adopted and relied on the enrolled-bill doctrine. *Id.* at 256-58 (Heiple, J., concurring in part and dissenting in part). He stated, in part, as follows:

"The interpretation of a constitutional provision depends, in the first instance, on the plain meaning of its language. Next, it depends on the common understanding of the citizens who, by ratifying the constitution, have given it life. A court looks to the debates of the convention delegates only when a constitutional provision is ambiguous. (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 492-93.) There is no ambiguity in the provision requiring the legislature to read a bill on three different days in each house, the provision that a bill receive a majority vote in each house, or the provision requiring the Speaker of the House and the President of the Senate to sign each bill to certify that the procedural requirements for passage have been met.

If it were deemed desirable to foreclose inquiries into the regularity of the passage of bills, language similar to the enrolled-bill doctrine could have been

included within the constitution. There is no such language. Moreover, the Illinois Constitution was adopted at a referendum. It did not become the law of the State by either the discussions of the delegates or by their votes. The constitutional convention merely submitted the document to the public for a vote. There is no way that a voter could interpret the language of the constitution to mean that procedural requirements for the passage of a bill could be overridden by the signatures of two State officers. In truth, the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.

A literal adherence to this so-called enrolled-bill doctrine means that a bill need never be read or presented in either house, need never receive a majority vote, and need never even be voted on. Two people, the Speaker of the House and the President of the Senate, need merely sign and certify a bill and, unless vetoed by the Governor pursuant to article IV, section 9, the bill becomes *ipso facto* the law of Illinois. Contrary to today's ruling, I believe that the constitutional requirements for the enactment of a bill should be followed and enforced. While separation of powers is a valid doctrine and a presumption of legislative regularity is its proper corollary, this court should reserve the right of review to ensure the General Assembly's compliance with constitutional mandates." *Id.* at 257-58.

¶ 96 Since that case, this court has noted the legislature has "shown remarkably poor self-discipline in policing itself in regard to the three-readings requirement." *Friends of the Parks*, 203 Ill. 2d at 329 (citing *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 260 (1992) (noting that "ignoring the three-readings requirement has become a procedural regularity"); *Cutinello v. Whitley*, 161 Ill. 2d 409, 425 (1994). That lack of legislative self-discipline continues to this day. See *Orr v. Edgar*, 298 Ill. App. 3d 432, 447 (1998) (leaving to this court "the issue of whether the state legislature may disregard constitutional requirements and maintain the legality of its actions under the auspices of the enrolled bill doctrine"); *New Heights Recovery & Power, LLC v. Bower*, 347 Ill. App. 3d 89, 100 (2004); *McGinley v. Madigan*, 366 Ill. App. 3d 974, 992 (2006); *Doe v. Lyft, Inc.*, 2020 IL App (1st) 191328, ¶¶ 51-55; *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶¶ 36-46; *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643,

¶¶ 220-41; *Rowe v. Raoul*, 2023 IL 129248, ¶ 8 (noting the plaintiffs raised a three-readings rule claim in the circuit court[1]).

¶ 97    In *Friends of the Parks*, 203 Ill. 2d at 329, this court noted it is "ever mindful of its duty to enforce the constitution of this state" and "urge[d] the legislature to follow the three-readings rule." The court went on to state that, "[w]hile separation of powers concerns militate in favor of the enrolled-bill doctrine [citation], our responsibility to ensure obedience to the constitution remains an equally important concern." *Id.*; see also *Field v. Clark*, 143 U.S. 649, 670 (1892) (stating it is "the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws"). In *Geja's Cafe*, 153 Ill. 2d at 260, this court declined the invitation to abandon the enrolled-bill doctrine, feeling "the doctrine of separation of powers is more compelling." However, this court deferred to the legislature "hesitantly" and "reserve[d] the right to revisit this issue on another day to decide the continued propriety of ignoring this constitutional violation." *Id.*

¶ 98    Recently, in a case involving the very Act at issue in this case, the Fifth District in *Accuracy Firearms* addressed the serious concerns raised by the plaintiffs there as to the legislature's repeated failure to adhere to the requirements of article IV, section 8(d), and the three-readings rule.

"Unfortunately, the Illinois Supreme Court's warnings regarding past legislative nonconformance with constitutional boundaries (see *Friends of the Parks*, 203 Ill. 2d at 328-29) appear to have gone unheeded and, instead, are now interpreted as the judiciary's acceptance of, or the judiciary's acquiescence in, the legislature's continued failure to adhere to constitutional procedures when enacting legislation. While compliance with the enrolled-bill doctrine presumes the legislative procedure adhered to constitutional requirements (see *Geja's Cafe*, 153 Ill. 2d at 259), such presumption is readily overcome by evidence revealing the contrary posted on the General Assembly website.

We question the sagacity of continued adherence to the Illinois Supreme Court precedent in light of the legislature's continued blatant disregard of the

---

[1]The *Rowe* plaintiffs did not raise the three-readings issue in their appeal to this court.

court's warnings and the constitutional mandates. The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote and allows the lawmakers to debate the legislation. Equally relevant to the three-reading rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated by failing to require the lawmakers to adhere to the constitutional principle.

To be sure, Illinois is not the only state that has faced or endured repeated ethical lapses associated with gut and replace legislation. However, other states have addressed this issue and demand compliance with the state constitutional mandates. See *Washington v. Department of Public Welfare of Pennsylvania*, 188 A.3d 1135 (Pa. 2018); *State ex rel. Ohio ALF-CIO v. Voinovich*, 69 Ohio St. 3d 225, 1994-Ohio-1, 631 N.E.2d 582; *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018); *League of Women Voters of Honolulu v. State*, 499 P.3d 382 (Haw. 2021).

Our lawmakers take an oath of office to ' "support the constitution of the United States, and the constitution of the state of Illinois." ' 25 ILCS 5/2 (West 2020); Ill. Const. 1970, art. XIII, § 3. The same is required for the circuit court judiciary (705 ILCS 35/2 (West 2020)) as well as the appellate and supreme courts and certain members of the executive branch (Ill. Const. 1970, art. XIII, § 3). Allowing lawmakers to continue to ignore constitutional mandates under the enrolled-bill doctrine, knowing full well the constitutional requirements were not met, belittles the language of the oaths, ignores the need for transparency in government, and undermines the language of this state's constitution." *Accuracy Firearms*, 2023 IL App (5th) 230035, ¶¶ 42-45.

¶ 99    Given the legislature's repeated failures, continued adherence to the enrolled-bill doctrine should no longer be countenanced. The doctrine "is contrary to modern legal thinking, which does not favor conclusive presumptions that may produce results which do not accord with fact." *Association of Texas Professional Educators v. Kirby*, 788 S.W.2d 827, 829 (Tex. 1990); *D&W Auto Supply v. Department of Revenue*, 602 S.W.2d 420, 424 (Ky. 1980) (stating the doctrine "frequently ***

produces results which do not accord with facts or constitutional provisions"). Moreover, "[t]he rule disregards the primary obligation of the courts to seek the truth and to provide a remedy for a wrong committed by any branch of government." *D&W Auto Supply*, 602 S.W.2d at 424.

¶ 100    Although this court has, in the past, found separation of powers to be a reason to decline abandoning the doctrine, it has not found it to be an absolute bar. This court has repeatedly reminded the legislature that it must comply with the bill-passage requirements of the constitution and, if it does not, this court reserves the right to act.

¶ 101    No doctrine can exempt from judicial review the requirements of the constitution. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

> " 'We may not abdicate this responsibility under the guise of our deference to a co-equal branch of government. While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation.' " *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 581 (Pa. 2003) (quoting *Consumer Party of Pennsylvania v. Commonwealth*, 507 A.2d 323, 333 (Pa. 1986)).

See also *D&W Auto Supply*, 602 S.W.2d at 424 (disagreeing with "the premise that the equality of the various branches of government requires that we shut our eyes to constitutional failings and other errors of our coparceners in government").

¶ 102    This court cannot cede the constitutionality of a statute to the Speaker of the House of Representatives and the President of the Senate. To turn a blind eye to repeated violations of the constitution suggests "that the courts must perpetually remain in ignorance of what everybody else in the state knows." *Power, Inc. v. Huntley*, 235 P.2d 173, 181 (Wash. 1951) (*en banc*); see also *D&W Auto Supply*, 602 S.W.2d at 423 ("To countenance an artificial rule of law that silences our voices when confronted with violations of our constitution is not acceptable to this court.").

¶ 103        As Justice Heiple suggested and as other courts have advocated, "the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met." *Dunigan*, 165 Ill. 2d at 28 (Heiple, J., concurring in part and dissenting in part); *Association of Texas Professional Educators*, 788 S.W.2d at 829 (stating "the present tendency favors giving the enrolled version only prima facie presumptive validity, and a majority of states recognize exceptions to the enrolled bill rule"). That "presumption may be overcome by clear, satisfactory and convincing evidence establishing that constitutional requirements have not been met." *D&W Auto Supply*, 602 S.W.2d at 425.

¶ 104        Given the record here, including taking judicial notice of the history of the legislation on the General Assembly's website, I would find the presumption is clearly overcome in this case. See *Board of Education of Richland School District No. 88A v. City of Crest Hill*, 2021 IL 126444, ¶ 5 (" 'Illinois courts often take judicial notice of facts that are readily verifiable by referring to sources of indisputable accuracy' such as court records or public documents, including records on [a] government website." (quoting *People v. Johnson*, 2021 IL 125738, ¶ 54)).

¶ 105        In this case, House Bill 5471 (HB 5471) (102d Ill. Gen. Assem., House Bill 5471, 2022 Sess.) was first introduced in the Illinois House of Representatives on January 28, 2022, as "an Act concerning regulation," seeking to amend the Illinois Insurance Code (215 ILCS 5/1 *et seq.*). The synopsis for HB 5471, which was approximately 10 pages in length, indicated the subject of the bill focused on providing the e-mail address of the public adjuster as well as other provisions regarding an insurance contract. 102d Ill. Gen. Assem., House Bill 5471, 2022 Sess. A second reading of HB 5471 occurred on March 1, 2022. *Id.* Then, along with 43 other bills voted on at the same time as a group, HB 5471 received its third reading (as a bill for an act concerning regulation) on March 4, 2022, receiving 104 yeas and 0 nays. *Id.*

¶ 106        On March 7, 2022, HB 5471 arrived in the Illinois Senate and received its first reading before being referred to the assignments committee. The second reading took place on November 30, 2022. *Id.*

- 28 -

¶ 107         On January 8, 2023, the President of the Senate filed Senate floor amendment No. 1, which, in its 110 pages, completely stripped the insurance provisions of HB 5471 and replaced them with the "Protect Illinois Communities Act." On January 9, 2023, amendments 2, 3, 4, and 5, all of which addressed amendment 1, were presented in the Senate and passed on its third reading with 34 yeas and 20 nays. *Id.*

¶ 108         In its new form, HB 5471 was sent back to the House on January 10, 2023. HB 5471, as amended, was not read three times prior to voting on the bill. On January 10, 2023, the House voted to concur with Senate amendments 3, 4, and 5 with 68 yeas and 41 nays on each one. That same day, the Speaker of the House of Representatives and the President of the Senate certified that the procedural requirements of the constitution had been met, and Governor Pritzker signed the 111-page Act into law. *Id.*

¶ 109         Here, it is abundantly clear that the Protect Illinois Communities Act was not before the House or the Senate on three different days in each house. On January 8 and 9, 2023, the original Insurance Code bill was gutted, and the new amendments, including the restrictions on assault weapons and large-capacity magazines, were considered and approved in the Senate. The new bill setting forth the Protect Illinois Communities Act then only spent one day in the House before it was passed and signed into law.

> "[T]he three readings requirement serves three important purposes: it (1) provides the opportunity for full debate on proposed legislation; (2) ensures that members of each legislative house are familiar with a bill's contents and have time to give sufficient consideration to its effects; and (3) provides the public with notice and an opportunity to comment on proposed legislation." *League of Women Voters of Honolulu v. State*, 499 P.3d 382, 396 (Haw. 2021).

See also *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring, joined by Minton, J.) (noting the three-readings requirement is intended "to make sure that each House knows what it is passing and passes what it wants"). On the contrary, the practice of gutting and replacing legislation "discourages public confidence and participation," "deprives the public of notice," and "is antithetical to the intent of the three readings requirement." *League of Women Voters*, 499 P.3d at 405.

¶ 110 In this case, the Insurance Code bill that received votes on three different days in the House in 2022 was in no way the firearms bill that passed the House on one vote in 2023. That is undeniable. And concluding that simply reading the title of a completely different bill on three different days suffices to pass constitutional muster is an affront to the people of this state and renders the three-readings requirement essentially meaningless. No such conclusion—whether expressed or implied—should receive the imprimatur of this court.

¶ 111 Article IV, section 8, of the Illinois Constitution requires a bill be read by title on three different days in each house. Three different days in each house is all it would have taken for the legislators to consider the firearms bill before passage and thereby comply with the procedural requirements of the constitution. And three different days in each house is all it would take for the House and Senate to conduct the legislative process again if this court were to find a violation of the three-readings rule and declare the Act unconstitutional.

¶ 112 When, as in this case, the work of the legislature directly impacts a fundamental right, which this court has said the right to keep and bear arms is (*Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 28), the people of Illinois deserve nothing less than the procedural requirements of the constitution be followed by their elected representatives and senators.

¶ 113 Because the procedural requirements of the constitution were not met in the passage of HB 5471, I would find the Act unconstitutional in its entirety. Thus, until this court has before it a validly passed act of the legislature, we should make no determination on the Act at issue in this case. Accordingly, I respectfully dissent.

¶ 114 JUSTICE OVERSTREET joins in this dissent.


¶ 115 JUSTICE O'BRIEN, dissenting:

¶ 116 I respectfully dissent because I do not find that the classifications at issue in this legislation further its claimed purpose and it is thus violative of the special legislation provision in our state constitution.

¶ 117 The special legislation clause states:

"The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13.

¶ 118    "This court has consistently held that the purpose of the special legislation clause is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis." *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 391 (1997). Under the clause, the General Assembly may not confer "a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." *Id.*

¶ 119    We employ a two-part test to determine whether a law is special legislation. *Piccioli v. Board of Trustees of the Teachers' Retirement System*, 2019 IL 122905, ¶ 18. The first determination is whether the classification discriminates in favor of a select group to the exclusion of a group similarly situated. *Id.* If the classification does discriminate, we next determine whether the classification is arbitrary. *Id.* We use the same standards applicable to equal protection challenges to decide if a classification is arbitrary. *In re Estate of Jolliff*, 199 Ill. 2d 510, 520 (2002).

¶ 120    Unlike the majority, I would find that the plaintiffs are similarly situated in light of the purpose of the legislation. *In re M.A.*, 2015 IL 118049, ¶ 29 ("The determination whether individuals are similarly situated generally can only be made by considering the purpose of the particular legislation."). We do so by considering whether the classification is "based upon reasonable differences in kind or situation, and whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute." *Best*, 179 Ill. 2d at 394.

¶ 121    The majority finds that the plaintiffs are not similarly situated to the exempted classifications and ends its analysis on that basis. To make the similarly situated determination, this court must view the classifications in light of the purpose of the legislation and the evils it seeks to remedy. *In re Belmont Fire Protection District*, 111 Ill. 2d 373, 380 (1986). The majority acknowledges that the legislation itself does not state a purpose but concludes that the defendants infer the intent of the Protect Illinois Communities Act (Act) (see Pub. Act 102-1116 (eff. Jan. 10, 2023)) is "to reduce the number of assault weapons and LCMs in circulation" because they are often used in mass shootings. *Supra* ¶ 51. The majority correctly reiterates that,

to determine whether the plaintiffs are similarly situated, the legislative purpose of the Act must frame its analysis. *Supra* ¶ 53.

¶ 122 The majority, however, did not consider whether the classifications further the legislative purpose of reducing the number of assault weapons and large capacity magazines (LCMs) and consequently the number of mass shootings. I find they do not and will not reasonably remedy the evils the legislation was designed to combat. Importantly, exempting the professionals and grandfathered groups does nothing to prevent the proliferation of out-of-state assault weapon possession or prevent those weapons from being used for mass shootings in this state or elsewhere. The legislation does not prevent weapon manufacturers, some located within this state, from continuing to sell assault weapons and LCMs to out-of-state residents, who may then potentially perpetrate a mass shooting. Because 60% of the weapons used in crimes in Illinois come from out of state, the legislation does not further its purported goal of reducing the number of weapons in the state. See Violence Prevention and Public Safety, Office of the Ill. Attorney Gen., https://illinois attorneygeneral.gov/Safer-Communities/Violence-Prevention-and-Community-Safety/Crime-Connect/ (last visited Aug. 7, 2023) [https://perma.cc/JWG4-5874].

¶ 123 Similarly, the enumerated professional groups who are exempted based on their firearm training and roles as societal protectors are presumably not apt to engage in mass shootings, and their ability to possess assault weapons and LCMs does not reduce either the number of assault weapons and LCMs or the threat of mass shootings. They may continue to possess and purchase the items the legislation bans nearly everyone else from possessing and purchasing. Moreover, not all the professionals are limited in the possession and use of their assault weapons to on-duty conduct, which places them in the same circumstance as members of the general public who may also have weapons training. For example, retired peace officers may continue to purchase and possess assault weapons despite that they no longer have any peacekeeping responsibilities or obligations. They are no different from private citizens who hold Firearm Owner's Identification cards, like the plaintiffs in this case, but are granted special treatment. Our constitution's prohibition against special legislation does not allow a law to afford special treatment to one group of citizens without a rational basis to do so. The special legislation provision in the constitution prohibits the different treatment of people based on criteria unrelated to the legislation's purpose. *Best*, 179 Ill. 2d at 391.

¶ 124    The professional group, albeit the recipients of firearm training, are not necessarily trained in assault weapons. Moreover, other nonexempted professionals and the general population may also have firearm and/or assault weapon training. According to an affidavit submitted by Caulkins in support of the plaintiffs' combined motion for declaratory judgment and/or temporary or permanent injunction, in his opinion, his gun shop customers are as skilled with their firearms as the exempted professional class. Limiting the possession and purchase of assault weapons to this group does not contribute to the reduction of mass shootings.

¶ 125    The grandfathered group, created because of their reliance interest in prior ownership of the banned weapons and magazines, are allowed to maintain their weapons, which also does little to reduce the number of assault weapons and LCMs or mass shootings. According to the plaintiffs, there are numerous Illinois residents who currently own assault weapons. Any one of these assault weapons owners could perpetrate a mass shooting.

¶ 126    When considering the challenged classifications in light of the purpose of the law, neither of the classifications furthers the purpose. In this way, I find the plaintiffs are similarly situated in light of the purposes of the legislation and the evils it was designed to remedy. It is not enough that the legislature classified the groups; the classifications must be based on "reasonable differences in kind or situation, and whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute." *Id.* at 394. The classifications must be founded on a rational or substantial difference of situation or condition. *Cutinello v. Whitley*, 161 Ill. 2d 409, 427 (1994) (Freeman, J., dissenting).

¶ 127    Here, the classifications afford special treatment to two groups of individuals without a viable connection between the exempted groups and reasons for the legislation. When considered in light of the offered purpose for the legislation, to reduce the number of weapons in order to reduce the number of mass shootings, the exempted classifications are in all aspects like the general population.

¶ 128    In dissenting, I do not pass judgment on the intent of the legislation. Rather, I only consider whether it meets the constitutional requirements under the equal protection and special legislation provisions of our Illinois Constitution. When we limit people's rights, even the rights we might not like, we have to do so in a way that honors the constitution.

"Unless this court is to abdicate its constitutional responsibility to determine whether a general law can be made applicable, the available scope for legislative experimentation with special legislation is limited, and this court cannot rule that the legislature is free to enact special legislation simply because 'reform may take one step at a time.' " *Grace v. Howlett*, 51 Ill. 2d 478, 487 (1972) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)).

Under the special legislation clause, the constitutional test is "whether a general law can be made applicable." *Id.* I would find a general law could be made applicable.

¶ 129    Because the majority fails to undertake this appropriate analysis and finds the plaintiffs are not similarly situated, I respectfully dissent. I would find the legislation violates the constitutional prohibition against special legislation.