NOTICE
Decision filed 05/02/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240112-U

NO. 5-24-0112

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| ACCURACY FIREARMS, LLC, *et al.*, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 23-MR-4 |
| | ) | |
| GOVERNOR JAY ROBERT PRITZKER, in His Official | ) | |
| Capacity; EMANUEL CHRISTOPHER WELCH, in His | ) | |
| Capacity as Speaker of the House; DONALD F. HARMON, | ) | |
| in His Capacity as Senate President, and KWAME RAOUL, | ) | |
| in His Capacity as Attorney General, | ) | Honorable |
| | ) | Douglas L. Jarman, |
| Defendants-Appellees. | ) | Judge presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justice Cates concurred in the judgment.
Justice Boie concurred in part and dissented in part.

**ORDER**

¶ 1   *Held*:   The circuit court properly dismissed the first amended complaint with prejudice where the circuit court followed and applied binding precedent from the Illinois Supreme Court.

¶ 2   The plaintiffs[1] appeal the August 15, 2023, order of the circuit court of Effingham County which dismissed, with prejudice, their first amended complaint against the defendants. For the

_____

[1]The plaintiffs include the first named plaintiff, Accuracy Firearms, LLC, and more than 7,000 other individuals and business entities. They will be referred to collectively as plaintiffs, unless otherwise noted.

1

following reasons, we affirm the circuit court's dismissal of the first amended complaint with prejudice.

¶ 3                                    I. BACKGROUND

¶ 4     In January 2023, the Illinois General Assembly passed Public Act 102-1116 (eff. Jan. 10, 2023), commonly known as The Protect Illinois Communities Act (Act). The Act added new provisions to the Criminal Code that restrict the purchase, sale, and possession of assault weapons (720 ILCS 5/24-1.9(b) (West 2022)) and large capacity ammunition feeding devices, commonly known as large capacity magazines (720 ILCS 5/24-1.10(b) (West 2022)). The Act's restrictions do not apply to (1) law enforcement agencies and individuals who complete firearms training as part of their employment in law enforcement, corrections, the military, and private security (trained professionals) (*id.* §§ 24-1.9(e), 24-1.10(e)) and (2) individuals who possessed assault weapons or large capacity magazines before the restrictions became effective (grandfathered individuals) (*id.* §§ 24-1.9(d), 24-1.10(d)).

¶ 5     On January 17, 2023, the plaintiffs filed a verified five-count complaint against the defendant. Counts I through IV sought a declaratory judgment that the Act was unconstitutional, and injunctive relief was requested in count V. On the same day they filed their complaint, the plaintiffs simultaneously filed a verified emergency motion for a temporary restraining order (TRO), which incorporated the verified complaint. The circuit court conducted a hearing on the emergency motion for TRO on January 18, 2023. On January 20, 2023, the circuit court entered a TRO. The matter then proceeded to this court for the first time as *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035. On January 31, 2023, the majority opinion issued by this court upheld the TRO. The *Accuracy Firearms, LLC v. Pritzker* opinion was later vacated by order of the Illinois Supreme Court on March 29, 2024.

¶ 6      Lawsuits similar to that filed by the plaintiffs in this action were filed by other plaintiffs throughout Illinois; one such case was filed by Dan Caulkins, *et al.*, on January 26, 2023, in Macon County. The circuit court of Macon County, relying on *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, granted summary judgment in favor of the *Caulkins* plaintiffs on their equal protection and special legislation claims. The appeal in the *Caulkins* case proceeded directly to the Illinois Supreme Court.

¶ 7      While the *Caulkins* appeal was ongoing, on March 10, 2023, the plaintiffs in the present matter filed their verified three-count first amended complaint. The allegations within the plaintiffs' first amended complaint mirror the *Caulkins* complaint. The factual background in the *Caulkins* complaint consisted of 17 paragraphs. The factual background in the plaintiffs' first amended complaint had the same exact 17 paragraphs, including identical typographical errors, with an additional 2 paragraphs. Count I of the plaintiffs' first amended complaint and count II of the *Caulkins* complaint sought a declaratory judgment that the Act violates the three-readings clause of the Illinois Constitution. The allegations in each complaint are identical. Count II of the plaintiffs' first amended complaint and count IV of the *Caulkins* complaint sought a declaratory judgment that the Act violates the equal protection clause of the Illinois Constitution. The allegations in each complaint are identical. Count III of the plaintiff's first amended complaint requested an injunction based upon the allegations set forth in counts I and II.

¶ 8      On August 11, 2023, the Illinois Supreme Court issued its opinion in *Caulkins v. Pritzker* and found, *inter alia*, that the exemptions in the Act "neither deny equal protection nor constitute special legislation because plaintiffs have not sufficiently alleged that they are similarly situated to and treated differently from the exempt classes." *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 4. Further, the *Caulkins* opinion abrogated the earlier *Accuracy Firearms* opinion from this court.

¶ 9    On August 15, 2023, the circuit court of Effingham County entered the following order: "This matter is taken off advisement. This matter having previously come on for hearing on Defendants' Motion to Dismiss, having considered the pleadings, the arguments, and applicable authority, now being more fully advised in the premises, I find and Order as follows: Plaintiffs filed the First Amended Complaint For Declaratory Judgment and Injunctive Relief challenging the constitutionality of the Protect Illinois Communities Act, also known as Public Act 102-1116 or House Bill 5471. In Count I, Plaintiffs alleged the act violates the three readings rule contained in the Illinois Constitution. In Count II, they alleged that exceptions to the prohibitions of possession, and sale of certain weapons, and devices contained in the act, violate the right to equal protection. Count III seeks a permanent injunction against enforcement based on the grounds alleged in Counts I and II. Since this court heard arguments on Defendants' Motion to Dismiss, Illinois Supreme Court issued its Opinion in CAULKINS v. PRITZKER, etal [*sic*] 2023 IL 129453. In that case the Court held that the exemptions contained in the act did not deny equal protection, and went on to say that the Plaintiffs in that case are not similarly situated to the trained professionals to which the exceptions apply. Based on CAULKINS v. PRITZKER, Count II is dismissed with prejudice. The Court did not address the three readings rule, because the Plaintiffs in that case failed to cross-appeal from the denial of relief on those grounds in the trial court. The Illinois Supreme Court has, however previously held that because of the enrolled bill doctrine upon certification by the Speaker and the Senate President, a bill is conclusively presumed to have met all procedural requirements for passage, including the three readings rule. GEJA'S CAFÉ, v. METROPOLITAN PIER & EXPOSITION AUTHORITY, 153 Ill. 2d 239, 258-260 (1992). Based on the enrolled bill doctrine, Count

4

I is dismissed with prejudice. Because both Counts I and II are dismissed with prejudice, there is no underlying claim to pursue, Count III is dismissed with prejudice."

¶ 10　　On September 14, 2023, plaintiffs filed a motion to reconsider, which argued it was error for the circuit court to *sua sponte* dismiss their complaint and that the *Caulkins* case did not foreclose the plaintiffs' claims. On October 16, 2023, the defendants filed a response in opposition to the motion to reconsider. The plaintiffs filed a reply to the response on November 6, 2023. The circuit court denied the motion to reconsider on January 18, 2024. Plaintiffs filed a timely notice of appeal the same day. Additional facts will be presented, where necessary, in the analysis.

¶ 11　　　　　　　　　　　　　II. ANALYSIS

¶ 12　　　　　　　　　　　　A. Standard of Review

¶ 13　　On appeal, the plaintiffs only challenge the *sua sponte* dismissal of their first amended complaint. On August 15, 2023, the circuit court of Effingham County dismissed the plaintiffs' first amended complaint based on Illinois Supreme Court precedent. Count I of the plaintiffs' first amended complaint was dismissed with prejudice pursuant to the enrolled-bill doctrine and *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 258-60 (1992). Count II of plaintiffs' first amended complaint was dismissed with prejudice pursuant to the Illinois Supreme Court's opinion in *Caulkins v. Pritzker*, 2023 IL 129453. Count III was dismissed with prejudice because it was premised on the claims set forth in counts I and II. This court reviews the dismissal of the plaintiffs' first amended complaint *de novo*. *Bilski v. Walker*, 392 Ill. App. 3d 153, 157 (2009).

¶ 14　　When considering "whether a complaint sufficiently states a cause of action, a court must accept all well-pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiff." *Id.* If the plaintiff can prove no set of facts that support the claim, the court should

5

dismiss the complaint for failure to state a cause of action. *Id.* "A [circuit] court may, on its own motion, dispose of a matter when it is clear on its face that the requesting party is not entitled to relief as a matter of law." *People v. Vincent*, 226 Ill. 2d 1, 12 (2007); see *Bilski*, 392 Ill. App. 3d at 156.

¶ 15                    B. Three Readings and Enrolled-Bill Doctrine

¶ 16    Count I of plaintiffs' first amended complaint sought a declaratory judgment that the Act was unconstitutional based on a violation of the three readings rule found in article IV, section 8 of the Illinois Constitution. Ill. Const. art. IV, § 8(d).

¶ 17    The common facts in the first amended complaint alleged, *inter alia*, that plaintiffs "desire to deliver, sell, import, or purchase an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge and/or manufacture, deliver, sell or purchase large capacity ammunition feeding devices as defined in 720 ILCS 5/24-1.9(a) and/or 720 ILCS 5/24-1.10(a)." That House Bill 5471 (HB 5471) was first introduced in the Illinois House of Representatives (House) on January 28, 2022, entitled as "An Act concerning Regulation." When introduced, HB 5471 was approximately nine pages in length and sought to amend provisions of the Illinois Insurance Code. The synopsis for HB 5471 indicated the subject of the bill was focused on providing the e-mail address of the adjuster as well as other provisions regarding an insurance contract. On March 4, 2022, HB 5471 received three readings in the House.

¶ 18    Additionally, the common facts alleged that on March 7, 2022, HB 5471 arrived in the Illinois Senate (Senate) and the first reading occurred the same day and it was referred to the Assignments Committee. The second reading of HB 5471 took place on November 30, 2022.

      "On or about January 8, 2023, which was a Sunday afternoon at 3:00 P.M., before the third

      reading occurred in the Senate, Senator Don Harmon filed Senate Floor Amendment No.

6

which completely stripped the insurance provisions of the bill, which were being considered by the legislature all the way up until this time, and completely replaced them with new substantive proposed changes governing weapons, human and drug trafficking." The following day, Amendments 2, 3, 4, and 5 were presented in the Senate, which were substantially similar to Amendment 1. After the Amendments were made HB 5471 was not read three times in the Senate. The Amendments passed the Senate on January 9, 2023, and the bill was sent back to the House on January 10, 2023. After returning to the House, HB 5471 was not read three times prior to voting on the bill. On January 10, 2023, the House voted to concur with the Senate amendments. After passing both the Senate and the House, Governor JB Pritzker (Pritzker) signed the Act into law. The Act includes 720 ILCS 5/24-1.9(a) and 720 ILCS 5/24-1.10(a).

¶ 19    Count I set forth additional factual allegations, including, *inter alia*, that:

"Plaintiffs acknowledge that a challenge to legislation under the Three Readings rule provided in Art. IV, Section 8(d) implicates the Enrolled Bill doctrine, which provides that, once the Speaker of the House and President of the Senate certify that the procedural requirements for passing legislation have been met, there is a presumption the procedural requirements have been satisfied."

While not a factual allegation, count I of the first amended complaint also set forth that the enrolled-bill doctrine should be abrogated.

¶ 20    The Illinois Supreme Court has unequivocally stated that "Illinois follows the enrolled-bill doctrine." *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328 (2003) (citing cases going back to 1992). As the court explained, "[t]his doctrine provides that once the Speaker of the House of Representatives and the President of the Senate certify that the procedural requirements for passing a bill have been met, a bill is conclusively presumed to have met all procedural

requirements for passage." *Id.* at 328-29. The court added that "[u]nder this precedent, we will not invalidate legislation on the basis of the three-readings requirement if the legislation has been certified," which means that when a bill has been certified, the act of certification has the effect of "precluding judicial review." *Id.* at 329.

¶ 21 The circuit and appellate courts of the State of Illinois are required to apply binding precedent from the Illinois Supreme Court to the facts of the cases before the circuit and appellate courts. See, *e.g.*, *Yakich v. Aulds*, 2019 IL 123667, ¶ 13. When the Illinois Supreme Court has declared the law on a point, only the Illinois Supreme Court can overrule or modify its precedent on that point. *Id.* Lower judicial tribunals, such as the circuit and appellate courts of this state, are bound by the decisions of the Illinois Supreme Court and have a duty to follow those decisions. *Id.* Although a lower court "is free to question the continued vitality of [a case], it lacks the authority to declare that precedent a dead letter." *Id.*

¶ 22 The plaintiff's first amended complaint acknowledged the enrolled-bill doctrine, as well as the fact that, in this case, the Act was certified pursuant to the doctrine but asserted that the enrolled-bill doctrine should be abandoned and/or abrogated. The circuit court did not err in dismissing count I of the first amended complaint based on the binding precedent concerning the enrolled-bill doctrine. We affirm the dismissal, with prejudice, of count I of the first amended complaint.

¶ 23 That said, we are not unsympathetic to the concerns raised by the plaintiffs with regard to the enrolled-bill doctrine. We further note that our ruling in this case provides the plaintiffs with the opportunity to attempt to present this issue to the one court that does have the authority to decide if it is the appropriate time for this issue to be revisited: the Illinois Supreme Court itself.

8

¶ 24                                    C. Equal Protection

¶ 25    Count II of plaintiffs' first amended complaint sought a declaratory judgment that the Act was unconstitutional because it violated the equal protection clause of the Illinois Constitution. The circuit court dismissed count II based on the *Caulkins* case and found the *Caulkins* court "held that the exemptions contained in the act did not deny equal protection, and went on to say that the Plaintiffs in that case are not similarly situated to the trained professionals to which the exceptions apply."

¶ 26    On appeal, the plaintiffs argue their case is different from *Caulkins*, so it should not have been dismissed. Specifically, the plaintiffs' brief argued, "[i]t is important to note the Caulkins case was not the same case as this case." However, our review of the operative complaints in the present matter and the *Caulkins* case leads to the determination that this argument is disingenuous.

¶ 27    Both the *Caulkins* complaint and the plaintiffs' first amended complaint contain allegations of common facts set forth under the heading "Factual Basis." The "Factual Basis" in the *Caulkins* complaint consists of 17 paragraphs, number 11 through 27. The "Factual Basis" in plaintiffs' first amended complaint contains the exact same 17 paragraphs as are in the *Caulkins* complaint, including the same typographical error in the second paragraph of the Factual Basis. The only differences in the Factual Basis section were the addition of the allegations contained in paragraphs 25 and 27 of the plaintiffs' first amended complaint and the addition of an omitted word and a change in verb tense in paragraph 26:

    "25. After the Amendments were made, HB 5471 was not read three times in the Senate.

    26. After returning to the House, HB 5471 was not read three times before the House voted to pass it.[2]

_____

    [2]In the *Caulkins* complaint, the allegation contained in paragraph 26 stated: "After returning to the House, HB 5471 was not three times before voting to pass it."

27. Both Speaker Welch and President Harmon certified the procedural requirements of the Illinois Constitution regarding the passage of bills were complied with before sending it to the Governor to sign."

The additions to plaintiffs' first amended complaint related only to the three readings claim.

¶ 28     The allegations contained within count II of the first amended complaint are identical to the allegations set forth in count IV of the *Caulkins* complaint. Count II of the plaintiffs' first amended complaint consisted of 50 paragraphs, number 47 through 96. Count IV of the *Caulkins* complaint contains identical language in 50 paragraphs, numbered 104 through 153.

¶ 29     During oral argument, counsel for plaintiffs was questioned regarding the identical nature of the equal protection claims set out in the *Caulkins* complaint and the plaintiffs' complaint. Plaintiffs' counsel argued that while the equal protection counts were very similar there were allegations in the plaintiffs' first amended complaint that were different. Specifically, this court was directed to paragraphs 89, 94, 96, and their respective footnotes, to support the plaintiffs' argument that their equal protection claim was different than *Caulkins*. Plaintiffs argue their equal protection claim was an as-applied challenge versus the facial challenge set forth in the *Caulkins* complaint.

¶ 30     Count II of the plaintiffs' first amended complaint set forth, *inter alia*, the following:

"89. It defies comprehension as to how Defendants could classify the Plaintiffs as a category of persons whose individual rights to bear arms must be restrained, but yet carve out a large class of persons who are wholly exempt based on their employment status. Footnote 6

* * *

10

94. Creating an exempt status for those persons is not only irrational and completely lacking anything approaching common sense, there are no set of facts wherein it can survive a constitutional attack based upon equal protection regardless of the standard of review. Footnote 7

* * *

96. Such actions by the Defendants are indisputably in violation of the Plaintiffs equal rights to be treated the same as their fellow citizens who are similarly situated in regard to their individual and fundamental constitutional rights to bear arms for self-defense.

* * *

Footnote 6: There is much to be said at some point regarding any alleged compelling public purpose which the Defendants may be seeking to further; however, given the complete abandonment of the legislative process the public record of HB 5471 is devoid of any evidence of what public purpose was being furthered. Quite simply this Court will be left to speculate on what that compelling purpose might be. Regardless, there is no rational basis, let alone reasoning which might withstand strict scrutiny, which justifies carving out large categories of citizens who are free to buy and possess without limitation based upon their employment status. How on earth can a citizens fundamental right to bear arms in furtherance of self-defense be categorized based upon where they work at a given moment in their life. For example, if a citizen is a jailer, he or she retains their rights, but at the moment he or she is no longer employed in that position, their rights expire. It's an absolute absurdity.

Footnote 7: Why understanding the reasoning of the Defendants in providing for such an exemption is wholly irrelevant, the Court should note the overwhelming connection of

many of those exempt persons is their status as belonging to a particular public union. One can't help but consider their very powerful lobbies were responsible for successfully carving out their members from being subjected to this law. What legitimate purpose can be gleaned from allowing for example a county jailer to be able to purchase, transfer, etc. a 50 caliber rifle at will when the rest of the citizens of the state are prohibited. It defies common sense and reeks of political patronage, but all that really matters is that it violates equal protection."

Count IV of the *Caulkins* complaint set forth, *inter alia*, the following:

"146. It defies comprehension as to how Defendants could classify the Plaintiffs as a category of persons whose individual rights to bear arms must be restrained, but yet carve out a large class of persons who are wholly exempt based on their employment status. Footnote 10

* * *

151. Creating an exempt status for those persons is not only irrational and completely lacking anything approaching common sense, there are no set of facts wherein it can survive a constitutional attack based upon equal protection regardless of the standard of review. Footnote 11

* * *

153. Such actions by the Defendants are indisputably in violation of the Plaintiffs equal rights to be treated the same as their fellow citizens who are similarly situated in regard to their individual and fundamental constitutional rights to bear arms for self-defense.

* * *

12

Footnote 6: There is much to be said at some point regarding any alleged compelling public purpose which the Defendants may be seeking to further; however, given the complete abandonment of the legislative process the public record of HB 5471 is devoid of any evidence of what public purpose was being furthered. Quite simply this Court will be left to speculate on what that compelling purpose might be. Regardless, there is no rational basis, let alone reasoning which might withstand strict scrutiny, which justifies carving out large categories of citizens who are free to buy and possess without limitation based upon their employment status. How on earth can a citizens fundamental right to bear arms in furtherance of self-defense be categorized based upon where they work at a given moment in their life. For example, if a citizen is a jailer, he or she retains their rights, but at the moment he or she is no longer employed in that position, their rights expire. It's an absolute absurdity.

Footnote 7: Why understanding the reasoning of the Defendants in providing for such an exemption is wholly irrelevant, the Court should note the overwhelming connection of many of those exempt persons is their status as belonging to a particular public union. One can't help but consider their very powerful lobbies were responsible for successfully carving out their members from being subjected to this law. What legitimate purpose can be gleaned from allowing for example a county jailer to be able to purchase, transfer, etc. a 50 caliber rifle at will when the rest of the citizens of the state are prohibited. It defies common sense and reeks of political patronage, but all that really matters is that it violates equal protection."

¶ 31    As the equal protection allegations in plaintiffs' first amended complaint were identical to those set forth in the *Caulkins* complaint, the circuit court did not err in dismissing count II based

13

on the *Caulkins* opinion from the Illinois Supreme Court. See *Caulkins v. Pritzker*, 2023 IL 129453. As set forth above, lower judicial tribunals are bound by the decisions of the Illinois Supreme Court and have a duty to follow those decisions. *Yakich*, 2019 IL 123667, ¶ 13.

¶ 32     On appeal, the plaintiffs briefly mentioned the fact that they were not allowed to amend their complaint prior to a dismissal with prejudice. However, this issue was not argued in the brief and no citations to authority were provided on this issue. Accordingly, this issue has been forfeited. "The well-established rule is that mere contentions, without argument or citation of authority, do not merit consideration on appeal." *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991). Further, it appears that plaintiffs desired to stand on the allegations of the first amended complaint as the plaintiffs' brief stated, "it was [plaintiffs'] position that no amendment was necessary." We affirm the dismissal, with prejudice, of count II of the first amended complaint.

¶ 33                    D. Injunctive Relief Requested

¶ 34     Count III of the plaintiffs' first amended complaint sought an injunction to enjoin the enforcement of the Act. The request for injunctive relief was premised upon the allegations set forth in counts I and II. As we have found that the circuit court properly dismissed counts I and II, it follows that count III was also properly dismissed. Furthermore, the plaintiffs provided no argument regarding the dismissal of count III. We affirm the dismissal, with prejudice, of count III of the first amended complaint.

¶ 35                    III. CONCLUSION

¶ 36     For the foregoing reasons, we affirm the August 15, 2023, order of the circuit court of Effingham County.

¶ 37     Affirmed.

14

¶ 38    JUSTICE BOIE, concurring in part and dissenting in part:

¶ 39    Given that the issues involved in this case pertain to a fundamental, constitutional right that is an essential safeguard to liberty, I feel compelled to write separately, and respectfully concur in part and dissent in part.

¶ 40                    A. Three Readings and Enrolled-Bill Doctrine

¶ 41    In this case, the plaintiffs alleged in count I of their first-amended complaint that the Protect Illinois Communities Act, Public Act 102-1116 (eff. Jan. 10, 2023) (Act), violated the three-readings requirement of the Illinois Constitution, and sought declaratory judgment that the Act was unconstitutional based on that violation. The majority opinion accurately sets forth the history of the legislation. House Bill 5471 (HB 5471) (102d Ill. Gen. Assem., House Bill 5471, 2022 Sess.) was first introduced in the Illinois House of Representatives (House) on January 28, 2022, and titled "An Act concerning Regulation," seeking to amend the Illinois Insurance Code (215 ILCS 5/1 *et seq.*). The focus of HB 5471 was, *inter alia*, to require that an insurance contract provide the electronic mail address of the insurance adjuster, along with other provisions regarding an insurance contract. On March 4, 2022, HB 5471 received three readings in the House. Nothing in the synopsis of HB 5471 changed during those three readings.

¶ 42    On March 7, 2022, HB 5471 arrived in the Illinois Senate (Senate) and received its first reading prior to being referred to the Assignments Committee on the same day. The second reading of HB 5471 took place on November 30, 2022, with no amendments to the bill. On January 8, 2023, at approximately 3:00 p.m. on a Sunday, the President of the Senate filed Senate floor amendment No. 1, which, in its 110 pages, completely stripped the insurance provisions of HB 5471 and replaced them with the "Protect Illinois Communities Act." On January 9, 2023, amendments 2, 3, 4, and 5, all of which addressed amendment 1, were presented in the Senate for

15

its third reading. After the Amendments were made HB 5471 was not read in full three times in the Senate. Rather, the following statements were made:

> "SENATOR KIMBERLY A. LIGHTFOOT [(presiding officer)]: Third reading. Now, on the Order of 3rd Reading is House Bill 5471. Mr. Secretary, please read the gentleman's bill.
>
> SENATOR NEIL ANDERSON [(Secretary)]: House Bill 5471. [Secretary reads title of bill] 3rd Reading of the bill." 102d Ill. Gen. Assem., Senate Proceedings, Jan. 9, 2023, at 18.

At that point, Senator Don Harmon took the floor making statements regarding the amendments made to HB 5471 and their importance. Senator Harmon stated that the "legislation I'm presenting is essentially the framework that the House sent over with changes recommended by advocates who've been pouring over the legislation to make sure it's as—it's as precise and as effective, as possible." There is nothing further from the truth than this statement. The amended HB 5471 had nothing to do with nor did it resemble its initial drafting and prior readings in the House and Senate. Nowhere in the amended HB 5471 is there a reference to providing the electronic mail address of the insurance adjuster or any other provisions regarding insurance contracts. I would note that, despite the complete substitution the body of the bill, the title of amended HB 5471 remained the same.

¶ 43    The transcript of the proceedings in the Senate indicates that, after beginning the session, a lengthy recess was taken by the Senate democrats for a caucus. 102d Ill. Gen. Assem., Senate Proceedings, Jan. 9, 2023, at 2. As noted by Senator Terri Bryant, HB 5471 should have been heard around 1:30 to 2:00 p.m. *Id.* at 23. According to Senator Bryant's statement, the Senate "wasted four or five hours today" due to the recess for caucusing, the proceedings were delayed for four to five hours and, accordingly, those members wishing to be heard were limited to five minutes each.

16

*Id.* Despite the complete transformation of the bill, the Senate approved the amendments, after hearing six members make comments, and the amended HB 5471 passed the Senate.

¶ 44    In its new form, HB 5471 was sent back to the House on January 10, 2023. Again, the amended HB 5471 was not read three times prior to voting on the bill, and the House voted to concur with the Senate's amendments. That same day, the Speaker of the House of Representatives and the President of the Senate certified that the procedural requirements of the constitution had been met, and Governor JB Pritzker signed the Act into law.

¶ 45    Article IV, section 8(d), of the 1970 Constitution, provides: "The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met." Ill. Const. 1970, art. IV, § 8(d). The Illinois Supreme Court held in *People v. Dunigan*, 165 Ill. 2d 235, 254 (1995), that "[w]hether or not a bill has been read by title on three different days in each house is a procedural matter, the determination of which was deliberately left to the presiding officers of the two houses of the General Assembly." I fully acknowledge that the supreme court has held that "Illinois follows the enrolled-bill doctrine" (*Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328 (2003)), and that the circuit and appellate courts of the State of Illinois are required to apply binding precedent from the Illinois Supreme Court. See, *e.g.*, *Yakich v. Aulds*, 2019 IL 123667, ¶ 13.

¶ 46    I cannot pass without comment, however, on the Legislative and Executive branches of our state government's continued disregard for the procedural rules and processes involved in passing laws in this state, then hiding behind and citing our supreme court precedent such as *Friends of the Parks* to justify their actions. I write separately to reiterate my dismay at the Legislature's complete disregard for the three-readings rule, and to urge a realistic assessment of

17

the enrolled bill doctrine in light of the numerous records before our courts that have clearly rebutted the presumption accepted by the same.

¶ 47    I agree with Justice Holder White, as outlined in her dissent in *Caulkins v. Pritzker*, 2023 IL 129453, joined by Justice Overstreet, that " 'the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.' " *Caulkins*, 2023 IL 129453, ¶ 103 (Holder White, J., dissenting) (quoting *Dunigan*, 165 Ill. 2d at 258 (Heiple, J., dissenting)). HB 5471 was completely gutted and changed by its amendments of January 8 and 9, 2023. The Insurance Code bill that was voted on by the House in 2022 bore no resemblance whatsoever to the firearms bill that passed the House on one vote in 2023.

¶ 48    The defendants argue in their brief that there were "multiple hearings" and HB 5471 was "rigorously debated." While this court is required to follow supreme court precedent, we are not obliged to abide such flagrant misrepresentation of the facts. While there may have been some discussions regarding the sweeping changes to HB 5471 during the committee sessions, the last-minute amendments, along with the improper procedures and delay tactics utilized on January 9, 2023, prevented any meaningful "hearings" or "rigorous" debates in the Senate. Given that HB 5471 was not amended until reaching the Senate, it defies reason to believe that there were meaningful hearings or debates on the ultimate subject matter of HB 5471.

¶ 49    The majority states that "we are not unsympathetic to the concerns raised by the plaintiffs with regard to the enrolled-bill doctrine." *Supra* ¶ 23. This language is similar to the language my colleague and I utilized in the majority opinion the first time this case came before this court in *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶ 42, *vacated*, No. 129421 (Ill. Jan. 24, 2024) (supervisory order) (Moore, J., dissenting) (*Accuracy I*), when we stated as follows:

18

"That said, we are not unsympathetic to the serious concerns raised by plaintiffs with regard to the issue raised in count II. Unfortunately, the Illinois Supreme Court's warnings regarding past legislative nonconformance with constitutional boundaries (see *Friends of the Parks*, 203 Ill. 2d at 328-29) appear to have gone unheeded and, instead, are now interpreted as the judiciary's acceptance of, or the judiciary's acquiescence in, the legislature's continued failure to adhere to constitutional procedures when enacting legislation. While compliance with the enrolled-bill doctrine presumes the legislative procedure adhered to constitutional requirements (see *Geja's Café*, 153 Ill. 2d at 259), such presumption is readily overcome by evidence revealing the contrary posted on the General Assembly's website.

We question the sagacity of continued adherence to the Illinois Supreme Court precedent in light of the legislature's continued blatant disregard of the court's warnings and the constitutional mandates. The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote and allows the lawmakers to debate the legislation. Equally relevant to the three-reading rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated by failing to require the lawmakers to adhere to the constitutional principle.

To be sure, Illinois is not the only state that has faced or endured repeated ethical lapses associated with gut and replace legislation. However, other states have addressed this issue and demand compliance with the state constitutional mandates. [Citations.]

Our lawmakers take an oath of office to ' "support the constitution of the United States, and the constitution of the state of Illinois." ' 25 ILCS 5/2 (West 2020); Ill. Const. 1970, art. XIII, § 3. The same is required for the circuit court judiciary (705 ILCS 35/2 (West 2020)), as well as the appellate and supreme courts and certain members of the executive branch. Ill. Const. 1970, art. XIII, § 3. Allowing lawmakers to continue to ignore constitutional mandates under the enrolled-bill doctrine, knowing full well the constitutional requirements were not met, belittles the language of the oaths, ignores the need for transparency in government, and undermines the language of this state's constitution." *Id.* ¶¶ 42-45.

19

¶ 50 After this court's decision in *Accuracy I*, our sister court addressed this exact same issue in an extremely pointed and critical opinion in *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643. The court stated:

> "We agree with the Fifth District's observations in *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶ 43, in which it wrote the following:
>
>> 'The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote and allows the lawmakers to debate the legislation. Equally relevant to the three-reading rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated by failing to require the lawmakers to adhere to the constitutional principle.'
>
> A bill's being read by title on three different days in *each house* deliberately slows down the legislative process so that legislators—and, more importantly, the general public—have time to review the bill, discern and evaluate its contents, form an opinion, and perhaps share that opinion with legislators and the public at large.
>
> * * *
>
> The Illinois Supreme Court last suggested some hypothetical line existed that the legislature might cross in *Friends of the Parks*, 203 Ill. 2d at 329, when that court wrote the following: 'While separation of powers concerns militate in favor of the enrolled-bill doctrine [citation], our responsibility to ensure obedience to the constitution *remains an equally important concern*.' " (Emphases in original.) *First Midwest Bank*, 2023 IL App (4th) 220643, ¶¶ 230-31, 236.

¶ 51 The Fourth District continued, outlining a compelling explanation of the legal pitfalls inherent in adopting and adhering to the enrolled-bill doctrine without any meaningful review by quoting the partial dissent in *People v. Dunigan*, 165 Ill. 2d 235 (1995), where Justice Heiple stated:

> "There is no ambiguity in the provision requiring the legislature to read a bill on three different days in each house, the provision that a bill

20

receive a majority vote in each house, or the provision requiring the Speaker of the House and the President of the Senate to sign each bill to certify that the procedural requirements for passage have been met.

If it were deemed desirable to foreclose inquiries into the regularity of the passage of bills, language similar to the enrolled-bill doctrine could have been included within the constitution. There is no such language. Moreover, the Illinois Constitution was adopted at a referendum. It did not become the law of the State by either the discussions of the delegates or by their votes. The constitutional convention merely submitted the document to the public for a vote. There is no way that a voter could interpret the language of the constitution to mean that procedural requirements for the passage of a bill could be overridden by the signatures of two State officers. In truth, the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.

A literal adherence to this so-called enrolled-bill doctrine means that a bill need never be read or presented in either house, need never receive a majority vote, and need never even be voted on. Two people, the Speaker of the House and the President of the Senate, need merely sign and certify a bill and, unless vetoed by the Governor pursuant to article IV, section 9, the bill becomes *ipso facto* the law of Illinois. Contrary to today's ruling, I believe that the constitutional requirements for the enactment of a bill should be followed and enforced. While separation of powers is a valid doctrine and a presumption of legislative regularity is its proper corollary, this court should reserve the right of review to ensure the General Assembly's compliance with constitutional mandates." *Id.* ¶¶ 257-58

¶ 52    Most recently, Justice Overstreet addressed the three-readings rule in his dissent in *Piasa Armory, LLC v. Raoul*, 2025 IL 130539; yet another example of the House of Representatives, after it introduced House Bill 3062 as a Landlord and Tenant Act amendment, completely gutted and amended the bill after its second reading in the Senate, to impose restrictions upon certain firearms. *Piasa Armory, LLC*, 2025 IL 130539, ¶ 65 (Overstreet, J., dissenting). Similar to the case at bar, the Senate, House, and Governor followed the same unprincipled procedures to pass the law. *Id.* ¶¶ 65-66, 68. In *Piasa Armory, LLC*, Justice Overstreet cited Justice Holder White's

21

dissent in *Caulkins*, joined by Justice Overstreet, and the majority opinion in *Accuracy I*, both referenced above. *Id.* ¶ 63. Justice Overstreet ultimately reiterated that "[t]he people of Illinois deserve nothing less than the procedural requirements of the constitution be followed by their elected representatives and senators." (Internal quotation marks omitted.) *Id.* ¶ 68.

¶ 53 The Illinois Legislature's disregard for constitutional procedure is alarming in and of itself, made more so by the fact that the Act directly impacts the fundamental right to keep and bear arms. The United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has "recognized that the Second and Fourteenth Amendments [(U.S. Const., amends. II, XIV)] protect the right of an ordinary, law-abiding citizen to possess a handgun" inside and outside the home "for self-defense." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-9 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (holding that the second amendment confers an individual right to keep and bear arms); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (holding that the fourteenth amendment incorporates the second amendment, rendering the second amendment applicable to the states).

¶ 54 The second amendment affords every law-abiding citizen the right to have firearms to defend and protect themselves in case of invasion by a foreign state and, importantly, from those non-law-abiding citizens or other bad actors who would do them harm. An extension of this right is the "duty" a citizen has to protect themself and their family in such an instance.

¶ 55 There is no doubt that there is a lengthy history of legislation, litigation, and state and federal precedent regarding the second amendment. It cannot be overlooked, however, that the Act and its prohibitions and restrictions on certain firearms and accessories will do little, if anything, to curb shootings within this state. Certainly, I am sympathetic to the victims and their families of

22

violent crime in Illinois and across this great country. Legislation such as the Act, however, will do nothing to stop violent crime or keep non-law-abiding citizens from having these types of firearms.

¶ 56    This state's criminal code is replete with offenses designed to keep firearms out of the hands of convicted felons. For example, unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1 (West 2024)); unlawful possession of a firearm by a repeat offender (armed habitual criminal) (*id.* § 24-1.7); and, unlawful possession of a firearm by a street gang member (*id.* § 24-1.8). The number of previously convicted, non-law-abiding citizens, that are charged with these types of offenses across our state each year is staggering. The Act will only prohibit law-abiding citizens the ability to protect themselves, their families, and friends from non-law-abiding citizens committing violence upon the good citizens of this state. These types of laws do nothing to deter non-law-abiding citizens from possessing and using firearms to threaten our communities. This is just one of the myriad fallacies inherent in this, and other laws restricting firearms in this state.

¶ 57    Nonetheless, here, the enrolled-bill doctrine allowed legislation effecting fundamental rights, passed with a clear "gut-and-amend" strategy, to go unchallenged in the courts. The Fourth and Fifth Appellate Districts represent the citizens of 89 of the 102 counties of Illinois. Both districts have weighed in on this issue with the resulting opinion that now is the time for our supreme court to revisit the three-readings rule and the enrolled-bill doctrine to address the Legislative and Executive branches' continuing disregard for the proper constitutional rules and procedures required for passing laws. As the Fourth District succinctly points out, the "delegates' belief that self-policing [will] occur was wholly mistaken," as is clearly indicated by its continuing actions. *First Midwest Bank*, 2023 IL App (4th) 220643, ¶ 238.

¶ 58     As such, I concur with the majority in holding that the circuit court did not err in dismissing count I of the amended complaint based on the binding precedent concerning the enrolled-bill doctrine. I also join the Fourth District in expressing my discomfort with being compelled to reject the plaintiffs' challenge when the violation of the rules and procedures is so blatant and obvious. As noted by the Fourth District, this court is "placed in a strange position when it is constitutionally required to turn a blind eye to a grave constitutional violation by a co-equal branch of government." *Id.* ¶ 240. I reiterate the majority's assertion that "our ruling in this case provides the plaintiffs with the opportunity to attempt to present this issue to the one court that does have the authority to decide if it is the appropriate time for this issue to be revisited: the Illinois Supreme Court itself." *Supra* ¶ 23.

¶ 59                          B. Equal Protection

¶ 60     I agree with the majority that the allegations contained in count II of the plaintiffs' first amended complaint are identical to those set forth in count IV of the *Caulkins* complaint, and did not assert an as-applied challenge, but a facial challenge to the Act. See *Caulkins*, 2023 IL 129453. However, my opinion is that the plaintiffs should have been given the opportunity to amend count II to allege an as-applied challenge to the Act.

¶ 61     The majority is correct that the plaintiffs made little argument regarding amending count II at the hearing on its motion to reconsider, and that the issue was not argued in their brief with citation to authority. The majority finds that this failure results in the plaintiffs' forfeiture of the issue on appeal. However, " 'forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent.' " *People v. Forthenberry*, 2024 IL App (5th) 231002, ¶ 16 (quoting *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65).

¶ 62    In this case, on March 31, 2023, the defendants filed a motion to dismiss counts I and III of the plaintiffs' first amended complaint, prior to the Supreme Court's decision in *Caulkins*. On May 4, 2023, a hearing was held on the defendants' motion to dismiss along with motions related to the plaintiffs' discovery requests. The trial court took all motions under advisement. The supreme court published its decision in *Caulkins* on August 11, 2023. On August 15, 2023, the trial court granted the defendants' motion to dismiss counts I and III of the plaintiffs' first amended complaint, and *sua sponte*, dismissed count II based on the *Caulkins* decision.

¶ 63    Whether a trial court correctly enters judgment on pleadings or dismisses a complaint is subject to the same *de novo* standard of review on appeal. *People v. Vincent*, 226 Ill. 2d 1, 14 (2007). Here, the trial court dismissed count II without any motion or responsive pleadings having been directed to the issue. Under the facts of this case, especially given the Act's direct infringement upon a fundamental, constitutional right, I would find the trial court erred in the *sua sponte* dismissal of the plaintiffs' undeveloped as-applied challenge.

¶ 64    The plaintiffs filed their motion to reconsider on September 14, 2023. In their motion, the plaintiffs argued, *inter alia*, that the defendants' motion to dismiss did not seek the dismissal of the entire case with prejudice, especially count II; and, that it was error for the trial court to *sua sponte* dismiss the case in its entirety. The plaintiffs further argued that the *Caulkins* case was factually distinguishable from this case and that the trial court erred in interpreting the *Caulkins* decision as an absolute bar for any matter to proceed which alleges an equal protection violation.

¶ 65    As-applied challenges are dependent on the specific facts and circumstances of the person raising the challenge; therefore, it is important that the record be sufficiently developed regarding the facts and circumstances of the claim. *People v. Harris*, 2018 IL 121932, ¶ 39. Our supreme court has repeatedly stated that " ' " '[a] court is not capable of making an "as applied"

25

determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional "as applied" is premature.' " ' " *Id.* (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 26, quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 66     While the plaintiffs did not request to amend count II at the time of the motion to reconsider, which would have served to clearly set forth their as-applied challenge, their arguments during the hearing on the motion to reconsider centered on an as-applied challenge to the Act. While count II can be construed as a facial challenge to the Act, which plaintiffs' counsel admitted during oral argument, liberally construed, count II at least references an as-applied challenge. Regardless of whether or not the plaintiffs would ultimately be successful on the merits, at a minimum, they should have been given the opportunity to develop the as-applied challenge.

¶ 67     Accordingly, I dissent from the majority's decision affirming the dismissal of count II of the plaintiffs' amended complaint and would instead remand the matter to the trial court to allow the plaintiffs to plead and develop their as-applied challenge.